TERRITORY OF MONTANA, respondent, *v.* LEE, appellant.

STATUTORY CONSTRUCTION — *void act.* Courts will not declare a statute void, unless there has been a manifest assumption of authority by the law-making power.

RIGHTS OF CHINESE UNDER " BURLINGAME TREATY." The sixth article of the treaty between the United States and the Empire of China, promulgated February 5, 1870 (16 U. S. Sts. 739), does not grant to the Chinese in the United States greater privileges than are guaranteed by the laws of congress to other aliens.

RIGHTS OF ALIENS UNDER ORGANIC ACT. The Organic Act of the Territory, approved May 26, 1864, does not sanction the principle of the common-law, which prohibits aliens from holding real estate.

MINERAL LAND — *power of congress and legislature.* Congress, by the acts relating to the mineral land of the public domain, approved July 26, 1866, July 9, 1870, and May 10, 1872, has recognized the authority of the legislative assembly of the Territory and miners of districts to enact laws regulating the extent of mining claims, which can be located, and the manner of working and developing the same, and appropriating the minerals therein contained. But the power to control and dispose of said land has been conferred upon congress by the constitution, and cannot be delegated to said assembly.

SAME — *act concerning aliens holding same, adjudged void.* The Territory has no right or title to the unappropriated mineral land within its boundaries. The act of the legislative assembly concerning mines held by aliens, approved January 12, 1872 (ch. 82, Cod. Sts. 593), which provides " for the forfeiture to the Territory of placer mines held by aliens," interferes with the primary disposal of the public domain within the Territory, and is, therefore, inconsistent with the sixth section of said Organic Act, and void.

POWER OF TERRITORIAL GOVERNMENTS — *sovereignty.* The Territory has none of the essential attributes of sovereignty, and is a province, over which congress exercises supreme control. The laws of the legislative assembly can be repealed by congress, and the Territorial courts have no final jurisdiction in cases in which the amount in controversy exceeds $1,000. The authority to enact laws for the forfeiture of mineral public lands is a prerogative of sovereignty, and cannot be exercised by said assembly.

RIGHT OF CITIZENS AND ALIENS TO MINERAL LAND. Said act of congress, approved July 26, 1866, gives to citizens, and those who have declared their intention to become citizens, the right to enter upon, explore and possess the mineral lands of the United States, and excludes therefrom the Territory, aliens and all others. *Held,* that this act does not authorize the forfeiture of the title of aliens to said land. *Held,* also, that aliens can hold and enjoy the possessory title to said lands within the Territory.

*Appeal from Second District, Deer Lodge County.*

THE judgment in this action was rendered by KNOWLES, J.

SHARP & NAPTON and S. WORD, for appellant.

A Territorial government is one of limited powers. The people are only authorized to act by virtue of the Organic Act. *Hepburn* v. *Ellzey,* 2 Cr. 445; *New Orleans* v. *Winter,* 1 Wheat. 91.

The " Alien Law " is not upon a rightful subject of legislation. It interferes with the primary disposal of the soil. 1 Kent's Com. 431; Organic Act; *Williams* v. *Bank,* 7 Wend. 539; 2 Story on Const. 192; *Scott* v. *Sandford,* 19 How. 395; Webster's Speech on Foot Resolution, January, 1830.

The Territory cannot acquire any title to unpatented mines. It cannot forfeit mines on account of alienage, and sell them for its benefit, when the fee simple is in the national government. An alien who works upon vacant mineral land is a trespasser upon the property of the United States, not upon that of the Territory. The national government, through its attorney-general, might have what is termed " office found,". and eject the trespasser. The Territory, through the district attorney, cannot. 1 Washb. Real Prop. 50. Sovereignty alone can drive an alien from a mine to which he has the possessory title.

The words " primary disposal of the soil," in the Organic Act, have a well-defined meaning. 2 Story's Const., ch. 30; 1 Bl. Com. 250. Congress used them in their legal sense.

The exercise of the power of alienage is that of a great sovereign power. *Augusta* v. *Earle,* 13 Pet. 559. Forfeiture is the penalty of a crime. The power exercised by the legislature in the passage of this law is that of escheat.

The act violates the " Burlingame Treaty." The subjects of China are guaranteed the rights of the most favored nations. Arts 5–6. Cannot a Chinaman lease property? If he can, he can become possessed of it. If you forfeit that, you interfere with the primary disposal of the soil. Blackstone says a lease is a primary conveyance, or disposal of the possession, or right of possession of the soil.

Legislatures cannot enact that one person can hold by comply-

ing with the law, and another shall not. Distinctions on account of race or color are "*ante bellum*" fossils.

H. N. BLAKE, District Attorney, First District, for respondent. J. C. ROBINSON, District Attorney, Second District, filed an argument in writing.

The act referred to by appellant should not be declared void, unless there is a clear repugnance between it and the constitution or law of congress. Sedgw. Const. L. 482; *S. & V. R. R. Co.* v *Stockton*, 41 Cal. 160; *Fletcher* v. *Peck*, 6 Cr. 87.

Under the laws of congress, the right to explore and occupy the mineral lands is limited to citizens of the United States, and those who have declared their intention to become such. This act of the legislature is in harmony with these laws and the common law. Yale on Mining Claims, 75–77, 355–357; Acts of Congress of July 26, 1866, July 9, 1870, and May 10, 1872; Bl. Com., Bk. 2, ch. 15, § 6.

This act was passed to prevent aliens from acquiring the right to work placer mines. It does not dispose of the soil of the Territory. The laws of the United States relating to preemptions, homesteads, railroad grants, etc., have disposed of the "soil." Washb. on Ease. 14, 596; *McClintock* v. *Bryden*, 5 Cal. 100; *Irwin* v. *Phillips*, id. 146; *Fitzgerald* v. *Urton*, id. 309.

Under this act, no right or title of the United States is sold or forfeited. The purchaser of the mine acquires the interest which the alien had.

At common law, an alien could not hold real estate. He could be divested of title upon inquisition by the attorney-general. 2 Kent's Com. 61. This principle is a part of the Territorial law. Organic Act, § 9.

This act is a rule adopted by the legislature according to the laws of congress, which have left the mode of acquiring possession, etc., to the miners and legislature.

WADE, C. J. This is an action brought under and by virtue of an act of the Territorial legislature, entitled " An act to provide for the forfeiture to the Territory of placer mines held by aliens," Cod. Sts. 593. The act substantially provides that no alien shall

be allowed to acquire any title, interest, or possessory or other right to any placer mine or claim, or to the profits or proceeds thereof in this Territory, and that whenever it shall be made to appear to any district attorney that any alien is in possession, occupation, use or enjoyment of any placer mine or claim, within the district of such district attorney, or that any alien claims any right, title or interest in or to any such mine or claim, by preemption, location, acquisition, or by gift, grant, bargain, sale, conveyance, transfer, assignment, lease or mortgage, it shall be the special duty of such district attorney, forthwith, to institute in the district court of the proper county an action in the name of the Territory, against such placer mine or claim for the forfeiture thereof to the Territory.    And the act further provides, that if upon the trial it shall be made to appear that the mine or claim in question is occupied, possessed or claimed by an alien, or that any right or interest therein has been sought to be conveyed to or vested in such alien, or in any one for his use or benefit, the court shall thereupon render a judgment of forfeiture to the Territory of such mine or claim, of whatever right, title or interest the alien would have acquired had he been a citizen ; and upon this judgment there shall be an execution and sale, for the benefit of the Territory, and the proceeds of such sale shall be paid into the Territorial treasury for the use of the Territory.

The complaint in this case sets forth the necessary averments under this statute, alleging that the defendant, Fauk Lee, is an alien, and a subject of the Chinese Empire, and that he purchased of one Stevens, and by virtue of such purchase now holds, claims, occupies, and is possessed of three thousand feet of placer mining ground in the complaint described.    There was a demurrer to the complaint, which was overruled, and judgment was rendered for the plaintiff, that the mining ground described in the complaint be forfeited to the Territory, and sold in pursuance of the provisions of the act aforesaid.    From this judgment defendant appeals to this court.

By this appeal we are called upon to determine the validity of the statute, under and in pursuance of which the action was brought and prosecuted to judgment, and in making this investi-

gation it will be convenient to inquire : first, what were the rights and disabilities of aliens in this Territory prior to the enactment of this statute ; second, as to the power of the Territorial legislature to enact a law of this character ; and third, is the act in question in harmony with the Organic Act of the Territory ?

1. As to the right of an alien to purchase and hold real property, it may be stated as a general principle, deducible from the authorities, that alienage is a disability that can only be taken advantage of by the government, or the sovereign power in a State, and that the real property purchased by an alien does not vest in the government until office found, that is, until a proceeding before a jury, to inquire as to the question of alienage, and, until such inquiry by the government, the alien is seized, and may protect and defend his property as a citizen, and may institute actions and prosecute suits under the laws for this purpose ; and that as to sales and transfers of real estate, by or to aliens, they stand upon the same footing as sales and transfers made by citizens, subject only to the right of the sovereign power of the government to institute proceedings to cause a forfeiture.

This proposition is sustained in 2 Blackstone, 249, note 18, wherein it is asserted that the law, as to purchases by aliens, is shortly this : that the purchase vests the land in the alien, but subject to be divested out of him for the benefit of the Crown, by the finding of an inquisition in the exchequer. An alien may be grantee in a deed, though his holding is precarious ; for, on office found, the king shall have it by his prerogative. 2 Black. 273, note 14 ; Co. Litt. 2, b ; 5 Co. 52 ; 1 Leon. 47.

" If," says Lord Coke (Co. Litt. 2), " an alien purchase houses, lands, tenements or hereditaments to him and his heirs, albeit he can have no heirs, yet he is of capacity to *take* a fee simple, but not to hold, for, upon office found, that is, upon the inquest of a proper jury, the king shall have it by his prerogative, of whomsoever the land is holden, and so it is if the alien doth purchase land and die, the law doth cast the freehold upon the king," but the estate purchased by an alien does not vest in the king until office found, until which time the alien is seized and may sustain actions for injuries to the property. 5 Co. 52, b ; 1 Leon. 47 ; 2 Black. 293, note 10.

An alien may purchase lands and hold them against all the world but the State. Nor can he be divested of his estate even by the State until after formal proceedings, called " office found;" and until that is done, may sell and convey or devise the lands, and pass a good title to the same. 1 Washb. Real Prop. 50, and authorities there cited.

An alien friend is entitled, at common law, not only to take and hold real estate, until office found, but to maintain an action for its recovery in case of an intrusion by an individual. *Bradstreet* v. *Oneida Co.*, 13 Wend. 546.

In the case of *McCreery* v. *Allender*, 4 Harr. & McH. 409, the supreme court of Maryland decided that the title of an alien friend is good against everybody but the State, and that his right and possession could not be divested but by office found, or some act done by the State to acquire possession, and judgment was given for the plaintiff, who was an alien and a British subject. See, also, *People* v. *Folsom*, 5 Cal. 373. This question has also been passed upon by the supreme court of the United States (*Craig* v. *Leslie*, 3 Wheat. 563), and the foregoing propositions fully and clearly sustained.

Alienage, then, is not a disability that can be taken advantage of by a private individual, and, as between citizen and alien, their titles are equally sacred and secure, and equally entitled to the protection of the law.

Only the sovereign power of the State or government can demand forfeiture of an alien's property, and this authority proceeds from the right of self-protection which inheres in every government, giving it the power of self-preservation. But this is a great sovereign prerogative right, which belongs only to the supreme power in a State, and cannot be exercised by any subordinate, secondary or limited depositary of power. The authority to naturalize and to impose disabilities upon aliens belongs alone to sovereign power, and this leads us to the discussion of the second proposition concerning the sovereignty of a Territory.

2. Does the Territory of Montana possess the inherent sovereign power necessary to enable it to cause the forfeiture to itself of the property of aliens, situate within its territorial limits? And does it possess the power to forfeit to its own use and benefit

property that never belonged to the Territory, in which the Territory never had any interest, the title to which still remains in the United States, subject only to a possessory easement acquired by individuals, by leave and license granted by the general government? In other words, can the Territory forfeit to its own use, and thereby become the owner of property which the government, in its liberality, granted only to citizens and to those who have declared their intention to become such? And if there is a forfeiture of this possessory title which the government has granted to individuals, does not the property forfeited necessarily revert back to the general government, the original grantor? The solution of these questions necessarily leads to a discussion of the sovereignty of a Territory under the constitution and government of the United States. Before entering upon this subject, however, we wish to premise by saying that primarily the general government is the owner of all the soil within its territorial limits, and that it is the fountain and source from whence all title to the soil is acquired, and that by reason of this fact the right of forfeiture vests in the sovereign power of the general government; and the particular inquiry now is: Are the organized Territories belonging to the United States clothed with this sovereign power?

What do we mean by the term "sovereignty?" It is the exercise of, or right to exercise, supreme power, dominion, sway; and, as applied to a State, it is the right to exercise supreme power, dominion, authority. Says Vattel in his Treatise on the Law of Nations: "Nations or States are bodies politic — societies of men united together for the purpose of promoting their mutual safety and advantage by the joint efforts of their mutual strength. Such a society has her affairs and interests. She deliberates and takes resolutions in common, thus becoming a moral person who possesses an understanding and a will peculiar to herself. From the very design that induces a number of men to form a society which has its common interests, and which is to act in concert, it is necessary that there should be established a public authority to order and direct what is to be done by each in relation to the end of the association. This political authority is the SOVEREIGNTY."

And this *sovereignty*, we may add, is the elemental prerogative of a nation, an essential attribute that gives to it being, life and

character, and without which it can have no existence. ' Sovereignty makes a nation; it forms a State, and the lack of it makes a colony, a province, a dependence. Sovereignty implies the right to make laws and to enforce them, and the laws it enacts cannot be modified, altered or abolished, except by the same supreme power which enacts them. To this power belongs the authority to define the rights of persons, and it may regulate the manner and circumstances under which property is held, and may direct the modes of administering justice.

To this power belongs the right to declare war; to raise and support armies; to make treaties of peace, and to use all necessary means to self-preservation and protection. Sovereignty then signifies independence, absolute freedom and liberty, and a superiority to and exemption from every foreign or extraneous influence. Every nation, like every individual, possesses the inherent right of self-defense, and for this purpose it may use or destroy the property of its citizens, and to this power of a nation may be referred its right to make laws of escheat, and forfeiture, providing when and under what circumstances property shall become forfeited to the State. The authority to enact laws of forfeiture is a sovereign prerogative, and belongs only to the supreme power of a nation. Is this sovereign power lodged in the Territory of Montana?

The region of country now included within the limits of this Territory was acquired by the United States from France by virtue of the Louisiana purchase in 1803. Out of this vast region thus acquired, several States have been formed and admitted into the Union, while in the balance of this Territory temporary governments have been established by congress preparatory to their admission as States. By what authority does congress thus assume to exercise jurisdiction and control over the several territories belonging to the government? We might well argue that the right to acquire territory implied the right to govern it, and, if there was no controlling law on the subject, it might be well said that if the United States has the right to purchase territory from a foreign power, it could, after the purchase, exercise absolute dominion and authority over the property so purchased, but we

are not compelled to resort to any implied power in determining the source of authority over the territories.

Section 3, article 4, of the constitution, provides that congress shall have power to dispose of and make all needful rules and regulations respecting the territory, or other property belonging to the United States. Under and by virtue of this clause of the constitution, from time to time congress has authorized and established temporary governments for the territories, the first of which was provided by the ordinance of 1787, and afterward adopted by congress, and from thence continuously until the present time. The governments thus established were and are temporary in their character, and only designed to subserve a temporary purpose. These governments were, and now are, and at all times have been, under the complete control of congress, and subject to abolition, modification or change, at the behest of the power which created them, and the laws enacted by the territorial legislatures are alike subject to modication or repeal by the action of congress. These inherent infirmities in the governments, and legislative enactments of the territories, at once rob them of all the essential attributes of sovereignty, and make them provinces, over whom the United States exercises supreme control. Under and by virtue of this clause of the constitution, above recited, congress could sell and dispose of a territory to a foreign power, and not only can it make all needful rules and regulations concerning the territories, but can also abolish them, and the rules and regulations made by congress are enacted laws, and congressional rules for the territories can be made in no other manner.

With these sovereign powers residing in the general government, it seems idle to contend that a territory is sovereign and supreme in any department of its authority.

These views and principles seem to be well supported by authority. Chancellor KENT, commenting upon the Territories belonging to the United States, says (vol. 1, pp. 383–5): "With respect to the vast territories belonging to the United States, congress have assumed to exercise over them supreme powers of sovereignty. Exclusive and unlimited power of legislation is given to congress by the constitution, and sanctioned by judicial decisions. * * * The general sovereignty existing in the govern-

ment of the United States over the territories is founded on the constitution, which declared that congress 'should have power to dispose of and make all needful rules and regulations respecting the territories.' * * * It would seem, from these various congressional regulations of the territories belonging to the United States, that congress have supreme power in the government of them, depending upon the exercise of their sound discretion."

The government of the United States, which can acquire territory by conquest, must, as an inevitable consequence, possess the power to govern it. The Territories must be under the jurisdiction and dominion of the Union, or be without any government; for the Territories do not, when acquired, become entitled to self-government, and they are not subject to the jurisdiction of any State. They fall under the power given to congress by the constitution. *American Ins. Co.* v. *Canter*, 1 Pet. 511.

In the same case, Marshall, C. J., says that congress, in legislating for the Territories, exercises for them the combined powers of the general and State governments.

Neither can it be said that congress, in giving to the Territories an organic act, delegates any of its sovereign authority; for not only can the organic acts be altered or abolished, but all laws made under and by virtue thereof, by the Territorial legislatures, are subject to congressional supervision, showing that sovereignty alone resides with congress. It may, however, be said that a Territory is a distinct political society, and, therefore, sovereign in its action, except as limited by the Organic Act, as the States of the Union are sovereign, except as limited by the Federal constitution. To this it may be answered that sovereignty does not abide with the Territory, for the reason that its action is subject to approval or disapproval by a higher authority, while congress exercises and can exercise no authority whatever over the enactments of a State legislature. To the State in the Union the people are secured the right of self-government, while the people of the Territories have not this right and depend for their government on the will of congress. The State regulates its own internal concerns, while congress directs the internal affairs of a Territory.

In a Territory the courts have no final jurisdiction. An appeal being allowed to the supreme court of the United States in every case, only limited by the amount involved, the legislature acts with limited and contracted authority, and all its laws and statutes are subject to the approval or disapproval of congress; and the power of the executive and the tenure of his office are likewise subject to the sovereign power and will of congress and the president, and in nothing pertaining to the existence, organization or power of a Territory is it sovereign and master of itself. The general government may sell it to a foreign power, may abolish its government, may annex it to another Territory, or may divide or change its form of government; its executive is the mere creature of the president and the senate; its organic act, creating a judiciary and a local legislature, may at any time be altered and abolished. Therefore it is that a Territory has no sovereign power or authority whatever, and, hence, has no authority to impose disabilities upon aliens within its limits, and much less has it the right to confiscate to its own use and benefit their property. Laws providing for the forfeiture of real estate, or any interest therein, while yet the title remains in the United States, and while, if any forfeiture is had, the property rightfully reverts to its original owner and proprietor, do not come within the scope of rightful subjects for Territorial legislation, for legislation upon this subject, by every analogy, belongs exclusively to congress.

Before the passage of this act of the Territorial legislature forfeiting the property of aliens within the Territory, the alien could hold, and did hold and enjoy, the possessory title to mining claims, procuring such title by purchase, which title was an easement therein, the balance of the title belonging to the United States, so that the alien and the government, taken together, owned the complete title. The Territory had no interest whatever in the claims, held by aliens or by any other persons, and no title or shadow of title thereto, but by the operation of this statute the Territory becomes the owner of the possessory title which is or may be the entire equitable interest, and is authorized to sell the same for its own use, so that, by the force of this statute, it becomes the owner of property in which it never had any interest, and which never belonged to it, and it forfeits the property of an

alien and calls it its own, while if any forfeiture takes place for any reason whatever, the property thus forfeited necessarily belongs to the United States. The Territory cannot acquire title to property that does not and never did belong to it, so easily as this.

There might be reason and plausibility in a statute of this kind, providing the Territory was clothed with sovereign 'power, and owned the paramount title to the property sought to be confiscated, but in the absence of sovereignty, and in the absence of any title or interest in the property, and while the general government is yet the owner of the legal title, and while, if any interest in the property is forfeited, it naturally and rightfully reverts to the sovereign, the general government, who holds the paramount title to all the property within its limits, it certainly is an unwarranted exercise of power for the temporary government of a Territory, to undertake, by forfeiture, to convert to its own use property, which, if subject to forfeiture at all, should be forfeited to the government of the United States.

Unquestionably, congress could enact and enforce a law similar in its provisions to the one under consideration, because it is clothed with the necessary power, and because the unoccupied lands in the Territories belong to the government, and it has the right to say who shall possess such lands; and exercising this right, by the act of July 26, 1866, the government authorized citizens, and those persons who have declared their intentions to become such, to enter upon, explore and possess such unoccupied mineral lands, and, if persons not authorized by this act, enter upon such lands, or if they acquire, by purchase, the possessory title to the same, and thereby the lands become subject to forfeiture, it is a matter for the general government to take action in relation to, and in which the Territory has no right and no interest. It will be observed that this act of congress does not prohibit citizens, who rightfully acquire this possessory title, from selling and transferring the same to aliens, or to any other persons. But with no statute upon the subject, and by virtue of the common law, if an alien takes a title to a possessory right in any such lands, upon proper inquisition before a jury, or upon office found, such title could be forfeited to the government, and this sovereign right be-

longing to the general government, the sovereignty of the Territories, as to this matter, is necessarily excluded.

Only those persons authorized by the act of July 26, 1866, are licensed to enter upon, explore and possess the mineral lands belonging to the United States. The persons given this right by virtue of this act are citizens and those who have declared their intention to become citizens. All others, by necessary implication, are excluded, and this exclusion would apply to a State, or a Territory, as well as to an alien, and the very terms of the act that excludes aliens from *entering* also excludes the Territory from *holding* the possessory title to the mineral lands, and an action for forfeiture by the general government against the Territory in such case would be much more appropriate than such an action by the Territory against an alien.

The Territory lacks three essential elements necessary and requisite in order to enable it to maintain this action, and in order to give validity to this statute. First. The sovereign power and authority to confiscate and forfeit to itself property, and especially property in which it has no interest, and no title, the sovereignty of the United States and its title necessarily excluding any action by the Territory; Second. The Territory is not the party in interest, and is officiously meddling with what does not concern it; and, Third. The inability of the Territory, under the act of 1866, to take and to hold the possessory title to the mineral lands belonging to the United States.

It is argued that this statute of the Territory does not conflict with the act of congress of 1866, which provides that only citizens, and those who have declared their intention to become citizens, shall have the right to enter upon and possess the mineral lands, and that this statute confiscating the possessory titles of aliens is only in aid of the act of congress. But it will be observed that the act of 1866 does not authorize the forfeiture of the title of aliens, and if it did the forfeiture would take place to the United States, and the Territory could take no action in the matter unless specially authorized by congress. The Territory is not called upon to aid congress or the executive in the execution and enforcement of the laws of the general government, and

the voluntary aid of the Territory is without authority, without reason, and therefore void.

3. Is the statute in question in harmony with the Organic Act of the Territory?

The Organic Act provides, section 6, that the Territorial legislature shall pass no law interfering with the primary disposal of the soil. Notwithstanding the Organic Act whereby a temporary government is created for the Territory, the general government, being the owner of the soil, still retains its ownership, and has made all the necessary laws and regulations directing how its property shall be disposed of, and how title thereto shall be conveyed. The Territory can enact no valid law that, in any manner, impedes, modifies or varies the operation of the laws of the general government as to the disposal of its lands. Neither can the Territory do, by indirection, what it is prohibited from doing directly, so that, if any Territorial statute, enacted for a local, or for a temporary purpose, in its workings, in its operations and effects, defeats the laws of congress as to the disposal of the public lands of the Territory, such statute is necessarily void. The statute in question provides that the mining claims held by aliens shall be forfeited to the Territory, so that the Territory becomes the owner of the possessory title to such claim. Laying aside the fact that the Territory thus becomes the owner of property that does not belong to it, yet it obtains possession of the title, and this possession necessarily interferes with the disposal of the soil by the United States to the citizen or settler. If the possessory title is forfeited, the property should again become subject to location by the persons entitled to make such location, but the Territory comes forward and says, by its legislature, "that although the title to this property is forfeited, and it thereby becomes subject to entry and location, yet I have acquired this property, and if any one obtains possession of it they must purchase of me." The Territory thus acquires a possessory title in violation of the act of 1866, and in direct violation of the Organic Act, for the title of the Territory interferes directly with the primary disposal of the soil to the citizen by the general government. It does not require argument or authority to determine that if the Territory holds possession of mining claims it

VOL. II. — 18.

interferes with the acquisition of possession by the citizen, and thereby interferes with the disposal of the soil; and the fact that the Territory is authorized to sell its possessory title by causing an execution to issue, does not help the matter, for by this means the primary disposal of the soil is transferred from the general government to the Territory. This statute is in conflict with the Organic Act.

The act of congress of May 10, 1872, "to promote the development of the mining resources of the United States," in its spirit and intention, is in direct conflict with the Territorial statute under which this action was brought. The act of congress, after defining the mode and manner by which titles to the mineral lands may be acquired, and providing when and to whom patents may be issued, enacts that "nothing herein contained shall be construed to prevent the alienation of the title conveyed by a patent for a mining claim to any person whatever;" that is to say, after the citizen, or those who have declared their intentions to become such, shall have acquired title to their mining ground from the government by patent, they shall have the right to sell the same to any person whatever, whether such person be alien or citizen, Chinaman or American. If the absolute title can be thus conveyed to an alien, it would be strange indeed if the mere possessory title or right could not likewise be conveyed to the same individuals. If the alien is made capable by the general government of holding the highest title, by what process of reasoning do we arrive at the conclusion that the Territorial legislature can say that if he acquires a mere possessory title, it shall be forfeited? It was clearly the intention of congress, by the act of May, 1872, to authorize and permit the citizen who had obtained a patent to his mining ground to sell the same to aliens if he so desired, thereby to aid the development of our mineral resources by the use of foreign capital; and as long as this act remains in force there can be no reason or validity in or to a Territorial statute subjecting the inferior titles of aliens to forfeiture and confiscation, while their absolute titles are made sacred by the act of the general government.

The judgment below is reversed and cause remanded.

*Judgment reversed.*

SERVIS, J., concurring. This was a proceeding, instituted by the district attorney for the second judicial district for the county of Deer Lodge, for the forfeiture to the Territory of Montana of 3,000 feet of mining ground, purchased by the defendant, Fauk Lee (a Chinaman), from one S. Stevens, in September, 1872, under an act passed by the legislative assembly of the Territory, January 12, 1872, entitled " *An act to provide for the forfeiture to the Territory of placer mines held by aliens,*" whereby all aliens are prohibited from acquiring any title, interest, or possessory or other right to any placer mine or claim within this Territory or to any profits or proceeds thereof. And it further provides for the mode of procedure to forfeit the same. Cod. Sts. 593.

To the complaint filed by the district attorney, the defendant, by counsel, *demurred,* as follows: *First.* To the jurisdiction of the court as to the person of the defendant, and the subject of the cause of action; and, *second,* for want of sufficient facts stated to constitute a cause of action; which demurrer was over-ruled by the court below, a decree of forfeiture entered, and the mining ground ordered to be sold as upon executions at law. From which the defendant appealed to this court.

The only question presented in argument, and raised by the demurrer, is as to the authority of the Territorial legislature to enact the law under which this forfeiture was had.

Assuming (as do counsel in argument) that the mining ground in controversy was, and is, a part and parcel of the public domain, had the legislative assembly of the Territory the rightful authority to enact the law now under consideration?

Legislative assemblies, like all other departments of the government, exercise only delegated authority; and any act passed by it not fairly falling within the scope of legislative authority, is as clearly void as though expressly prohibited.

A correct solution of the question before us necessarily leads to an examination, not only of the Organic Act of the Territory, but also of some of the provisions of the constitution of the United States.

It is the right of the legislative assembly to enact laws under the restrictions of the Organic Act and the constitution, and the province of the courts to construe them.

The presumption is always in favor of the validity of such laws, and it is only when there is manifest assumption of authority, and a clear incompatibility between them and the fundamental law, that judicial authority will refuse to execute them. And although it has often been truly said that courts, when called upon to construe laws with respect to their constitutionality, are always treading upon dangerous ground, and that objections to declaring a statute void should ever be listened to with attentive earnestness, yet this duty, which no judge should court, is one from which no judge should shrink.

With this statement of the case and the relative rights and duties of the law-making and law-construing powers, let us proceed to an examination of the question before us.

The 6th section of the Organic Act of this Territory provides "that the legislative power of the Territory shall extend to all rightful subjects of legislation consistent with the constitution of the United States and the provisions of this act; but no law shall be passed interfering with the primary disposal of the soil."

And by the 3d section of the 4th article of the constitution of the United States it is provided: · "The congress shall have power to dispose of, and make all needful rules and regulations respecting the Territory or other property belonging to the United States. * * *"

And again, it is also provided by the 14th amendment to the constitution, section 1: "* * * Nor shall any *State* deprive any *person* of life, liberty or property without due process of law, nor deny to any *person* within its jurisdiction the equal protection of the laws."

Before proceeding to an examination and application of these fundamental principles to the question under consideration, I cannot pass unnoticed, at least to some extent, the able arguments of the respective counsel. The counsel for the appellant urge and insist that the treaty made by the government of the United States with the Empire of China, and approved February 5, 1870, called the "Burlingame treaty," guarantees to the defendant, as well as to all subjects of the Chinese Empire within the United States, the same privileges, exemptions and immunities as are here possessed and enjoyed by American citizens.

The article of the treaty referred to, whereby it is assumed these rights are guaranteed, is article 6 of that treaty (16 U. S. Sts. 740), which provides: "Citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities or exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation; and, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities and exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation."

This provision of the treaty, in my judgment, does not and cannot, by any construction, liberal or otherwise, grant, either to the American in China, or to the Chinaman in America, any greater privileges than are guaranteed by the laws of the respective countries to *other* alien subjects; and this is not only the literal, but the correct interpretation of this provision of the treaty.

Then, *what* rights and privileges are, by the constitution and laws of the United States, guaranteed or granted to *all* aliens? And the answer is found in the various enactments of congress, to which I shall presently refer, and which were passed both before and since the ratification of the "Burlingame treaty," wherein congress not only assumes control over the Territories, but especially provides that *none but citizens* of the United States, or those who have declared their intentions to become such, *shall possess* any of the public domain; and these acts of congress so far have never been repealed.

It is urged, by counsel for the Territory, that, inasmuch as the character of the property in question has always been treated as real estate, and that by the common law an alien could not hold or enjoy the same, within the United States, this principle of the common law, if not directly, at least by implication, has been engrafted into the Organic Act of this Territory, and that therefore the act in question was one of rightful legislation.

It must be observed that the remedy hitherto provided for a violation of this principle of the common law was never such as is attempted in the act under consideration; but the mode of procedure has always been by the general government, through its attorney-general, in the nature of what is termed *office found,*

whereby the alien trespasser was ejected from the premises, which then became *publici juris*, and resort to legislative confiscation and forfeiture were never had; and if this principle of the common law has in fact been engrafted into the Organic Act, it could have no greater effect than a simple continued recognition of that principle; but I do not think that, by any known rule of construction, it can even be inferred that any such principle is contained in the Organic Act of this Territory.

When the framers of the great fundamental law of the land provided, " The congress shall have power to dispose of and make all needful rules and regulations respecting the Territory or other property belonging to the United States," they did not intend thereby that the congress should delegate that power to some other inferior legislative assembly, else they would have so said. Neither did congress so understand or intend, when it created and organized this Territory, for it is thereby and therein provided, that all Territorial legislation shall be consistent with the constitution and with the Organic Act; and that no law shall be enacted by the legislative assembly of the Territory in any wise interfering with the primary disposal of the soil.

It is urged, in support of the validity of this so-called " Alien Law," that it is not an interference with the primary disposal of the soil, but that it is only a " *rule* " or sort of police regulation, regulating the possessory tenures to the public mines; and that such right so to regulate and rule the same is recognized by the various acts of congress, passed July 26, 1866, July 9, 1870, and May 10, 1872, whereby the mineral lands of the public domain are declared free and open to exploration, occupation and purchase by citizens of the United States, and those who have declared their intentions to become such, under regulations provided by law, and according to the local customs or rules of miners in the several mining districts, *so* far as the same are applicable and not inconsistent with the laws of the United States.

These acts of congress do most unquestionably recognize in local legislative assemblies, as well as in properly organized assemblies of miners in their respective mining districts, the authority to *regulate* the exploration, occupation and purchase from one another of such unoccupied parts of the public mineral domain as

may be within their respective local jurisdictions, so far as the same may be applicable thereto and not inconsistent with the constitution and laws of the United States.

But the *extent* to which these local legislative bodies can regulate these possessory tenures of the public domain seems to be the all-absorbing question to be determined. All that local legislation has done, or may do, can, by the congress, be undone and wholly abrogated. It cannot only do this, but it can repeal *all* laws upon the subject, and enact others in their stead; and I am of the opinion that congress, in assuming control over the Territorial domain under the constitution, and in passing laws regulating the same, has only recognized the right of local legislation, so as to make rules for the amount to be located, the manner of working the same, together with necessary rules to the complete development thereof, and appropriation of the minerals therefrom. And this is the *extent* of recognized local legislation thereon. Any attempt by local enactment, whereby to oust one person from a possessory right acquired under the act of congress granting freedom to the mines without title, and putting another in possession thereof, whether the possession from which he may be ousted be lawful or unlawful, is an unauthorized assumption of power, and void. Such an act, although it may not, in fact nor in fee, dispose of the soil, is nevertheless an interference with the primary disposal of the soil. It deprives the once occupant thereof from holding and working the same, and by its operation pretends to transfer, under judicial proceedings, a once acquired possessory right, whereby the citizen is prohibited and prevented from taking up or entering upon the same, or the government from conveying the same by patent, as otherwise the citizen or government might.

Had the government, after the passage of this act, issued its patent to the defendant for the very mining ground in question, whether authorized or unauthorized, would it not be absurd to claim that the Territorial legislature could assume such superiority over the general government as to cancel or annul it? Certainly not. But this is no more absurd and inconsistent than is the Territorial act itself. That act declares that an alien has not, cannot, and shall not have *any interest* in placer mining ground within

the Territory, and by the same act provide for the forfeiture of that *no interest*, and for a sale and conveyance thereof.

What, I ask, is to be forfeited? What to be sold and conveyed? Simply a *trespass*, and that, too, that was not a trespass to the Territory, nor to any of its property, but if a trespass at all, a. trespass upon the lands of the general government, over which the Territory could not exercise any control, for, as I have already shown, such power was *reserved to the congress*, and it has from time to time ever since exercised such control by seemingly proper and legitimate legislation.

Of this reserved power in the constitution I think there can be no doubt. The language used in section 6 of our Organic Act is borrowed from those of the earlier Territories — Dakota, Nevada, Nebraska and Colorado, where it has ever been understood as containing a full reservation of the right of congress over the Territories and the public domain.

So strongly has congress emphasized its power over the public domain that in the acts admitting States into the Union the people are required to agree and declare that *they forever disclaim any right or title to the unappropriated lands within the Territory.* See for instance the enabling act of Nebraska, approved April 19, 1864.

If, then, a *State* cannot control or interfere with the disposal of the public lands within its boundaries, nor deny to any person within its jurisdiction the equal protection of the laws (although congress may, and has), much less can a Territory.

I am therefore of the opinion that the said act, entitled "An act to provide for the forfeiture to the Territory of placer mines held by aliens," is inconsistent with the Organic Act of the Territory, repugnant to the constitution of the United States, and therefore void.

KNOWLES, J., dissenting. I cannot agree with the majority of the court in this case, for the following reasons:

When a citizen of the United States locates any portion of the public domain, containing precious metals, in accordance with the local rules and regulations of miners, the government of the United States becomes divested of an easement in that particular

portion of the public domain, and such locator becomes the owner thereof. To the extent of this easement, that parcel of mining ground ceases to be public domain. The government has parted with the title to this extent, and a citizen has acquired it. This court has held this view in the case of *Robertson* v. *Smith*, 1 Mon. 410.

To the extent of this easement, I do not see that any portion of mining land, so acquired, is any more public domain than a section of agricultural land for which the general government has given a patent to a pre-emptor. It is true, all the title, except this easement, is in the general government, and to that extent and no more it is public domain. In the opinions of my brother judges, they, in effect, say, that the paramount title to mineral ground, although the same may be properly located, is still in the general government. When a person has parted with a title to land, how can he be said to have the paramount title still to it?

This court, in the case above referred to, held, that when mining ground was properly located, the government parted with the title to an easement in the same. How then can it be maintained that the government still has the paramount title to this ground so far as this easement is concerned?

There appears to have been an impression, on the part of my brother justices that, should the Territory forfeit and sell this easement, the purchaser would acquire a greater interest in the land than the first locator of the mine. This is not so, however. He would take only a mining easement, and he would take this subject to the conditions, the mining rules and regulations attached to the estate, namely, the conditions of forfeiture should he fail to comply with them. Again, it is claimed that this law under consideration interferes with the primary disposal of the soil. What is understood by the phrase "primary disposal of the soil?" The disposal of it by the general government, nothing more. But when mines are duly located, the government has disposed of the ground containing them to the extent of an easement. All the law under consideration proposes to do is to forfeit this easement. How then can this law interfere with the primary disposal of the soil, when to the extent this law affects the

VOL. II.—19.

soil the government has already disposed of it? The chief justice, in his opinion, holds that a forfeiture of land conveyed to an alien can only be made to the sovereign power in the State. And he claims that the Territory of Montana has no sovereignty, but that all the sovereign power within its borders is vested in the general government of the United States, and hence that this government is the only one that can claim forfeiture of real estate sold to an alien. I know that there has been a good deal of talk about a Territory not being sovereign, but this is the only legal opinion of which I have any knowledge that so decides. All of the decisions in relation to organized Territories speak of them as governments. Our Organic Act calls this a temporary government. Let us see what this government is. It has an executive department, a judicial department and a legislative department. What powers are vested in each?

The executive power is vested in a governor. It is provided that he shall be the commander-in-chief of the militia of the Territory; he may grant pardons and respites against the laws of the Territory; he shall commission all the officers of the Territory who shall be *appointed* to office under the laws thereof; he shall take care that the laws be faithfully executed, and possesses the veto power. Are these not attributes of sovereignty?

The legislative authority is vested in a governor and a legislative assembly. The legislative power extends to all rightful subjects of legislation consistent with the constitution and laws of the United States, and the provisions of our Organic Act. It has, under such a grant, power to provide for the levying and collection of taxes; to pass laws for the punishment of all crimes and misdemeanors; to regulate domestic relations; to regulate the conveying and tenure of property; to regulate and give the power of transmitting by devise and wills, and the distribution of estates among heirs. It has the power to organize the militia of the Territory, and to provide for calling the same to suppress insurrection against the laws of the Territory, to repel the invasion of hostile Indians into the settled portions of the Territory, and even to repel the invasion of a foreign power invading its limits. Other powers might be enumerated. I do not think any State legislative authority in the Union has a more extensive grant of

legislative powers.   One further point may be noticed that will show more fully the extent of the power of our legislative department, and the character of our Territorial government, namely, the legislative authority may grant a charter to a municipal corporation.   This right has never been doubted.   The city in which this court is now sitting has a charter of incorporation granted by the legislative department of the Territory.   If the government of this Territory was but a municipal corporation, similar to that of a city government organized by a State legislature, could it possess such powers?   Can a municipal corporation create a municipal corporation?   The legal decisions of the past may be searched in vain for authority to sustain the exercise of such powers by a municipal corporation.   It may be that since the amendment to our Organic Act, the power to charter corporations has been somewhat limited.   If the legislative authority of the Territory did formerly possess the power to charter corpora tions to as unlimited an extent as a State, what was the necessity of that amendment?

The judicial power of the Territory is vested in a supreme court, district courts, probate courts and justices of the peace. The jurisdiction of these courts is as limited by law; that is, by the laws of our legislative authority.   It is also provided that the said supreme court and district courts shall possess chancery as well as common-law jurisdiction.   What more extensive judicial powers are vested in any State government in the Union?   We have a government then, I hold, with an executive, who possesses, in almost every essential particular, the same powers as the governors of the several States in the Union.   We have a legislative assembly that enacts laws, not by-laws, and whose legislative power is not surpassed by the legislative authority of any State government.   We have a judicial power, as extensive as any State, vested in courts, whose authority to enforce their judgments and orders is full and complete, and whose judgments would undoubtedly have the same force and effect in a foreign nation as those of any State in the Union, and would have the same force in any State as the judgments of another State, were it not for the provisions of the national constitution.   Yet it is held that, because all these powers are granted to our government .

by an act of congress, it does not possess sovereignty. What does invest a government with sovereignty but the possessing and exercising of sovereign powers. Does it make any difference from whence sovereign powers are derived, whether from God, as claimed by kings, or from the people, as claimed by republics, or from a government possessed with the sovereignty over a country, as the United States has over the Territories? The United States government has only such sovereign powers as the people have granted or delegated to it. It does not claim to have received any power from a Divine source. Is it not sovereign? But it may be said that these powers are granted or delegated in perpetuity. Not so; there is a right reserved to amend our national constitution, and by virtue of this right, any sovereign power it now possesses may be taken from it. But suppose these sovereign powers are granted to the national government in perpetuity, and the sovereign powers bestowed upon a Territory are given temporarily. Can it be a safe rule to follow, in determining whether or not a government is sovereign, the ascertainment of whether the powers it possesses were given it in perpetuity or temporarily. There is no reason in such a rule.

If any government in the limits of the United States can be said to possess sovereignty, it must be because it has and exercises sovereign powers. It is said that the general government may divide our Territory or attach it to a State or another Territory. The general government reserved this right in our Organic Act. If a reservation in an Organic Act prevents a government from being sovereign, then the United States government is not sovereign, because there are reservations and limitations in our national constitution. And it might be pertinent to inquire, why was it thought necessary to put these reservations in our Organic Act? I cannot see how a reservation in an Organic Act prevents the sovereign attributes possessed by the government it organizes from being attributes of sovereignty, and that government, to the extent of these sovereign powers, from being sovereign, unless it takes something more than the rightful possession of sovereign powers to make a government sovereign. Again, it is said the general government might sell our Territory. This power may be doubted. But admit that it can sell its power of eminent

domain, can it sell the government called the temporary government of Montana Territory? That is what I claim possesses sovereignty. Can it sell the sovereign powers it has granted to this government? Can it farm out its executive, legislative, or judicial departments? If so, it is fortunate, perhaps, for our people that public virtue is so pure and exalted. I think my brothers, finding that our Territorial government is lacking in some of the attributes or prerogatives generally found possessed by sovereign powers, have shut their eyes to the sovereign powers it does possess and found no sovereign powers reposed in it. But such a rule would find that, because the Queen of England did not possess as many sovereign powers as King William of Prussia, or the Czar of Russia, therefore she has no sovereign powers. The Territory of Montana having sovereign powers, I hold that, to the extent of these, she is sovereign; that in determining whether or not a government in the United States is sovereign, we should not look to the source of its powers or to their extent or duration, but to their possession. The right of congress to grant to Territorial governments the powers they possess has been acquiesced in by all the national courts. And they seem to have based this right upon the proposition that the United States is vested with sovereignty, as far as the Territories are concerned, just as, primarily, all sovereignty was vested in the people of the United States, and that as the people could grant the sovereignty they possessed to the National and State governments, so could the United States grant its sovereignty save as to national matters to the Territorial governments. Whether or not this theory was based upon sound judicial principles in the start, it is not pertinent now to inquire. The general government has acted upon this theory so long that it is undoubtedly now the law.

Mr. Justice Story, in his work on the Constitution, says: "Having a right to erect a Territorial government, they may confer on it such powers, legislative, judicial and executive, as they may deem best. They may confer upon it general legislative powers, subject only to the laws and constitution of the United States."

Again, in speaking of the courts created for a Territory, he

says: "They are legislative courts, created in virtue of the general right of sovereignty in the government, or in virtue of that clause which enables congress to make all needful rules and regulations respecting the Territory of the United States." 2 Story on Const., § 1325.

Judge KENT, in his Commentaries, says: "With respect to the vast Territories belonging to the United States, congress have assumed to exercise over them supreme powers of sovereignty." 1 Kent's Com. 384.

In the noted case of *Dred Scott* v. *Sandford*, all of the judges agreed that, from some source, congress had the power to form GOVERNMENTS in the United States Territory. The only dispute between the chief justice and myself upon this point is, as I understand it, as follows: He holds that congress or the United States has sovereign power over a Territory, and that this sovereignty it has not or cannot delegate or grant to a Territorial government; while I hold that all the sovereign powers a Territorial government possesses were primarily reposed in the general government, and that these it has granted to it. If it is claimed that the delegating or granting of sovereign powers to a government does not make it a sovereign power, then I answer that the government of the United States and the governments of the several States have no sovereignty, because it is an accepted theory of our government that the people are sovereign, and have granted or delegated to our governments some of their sovereign powers.

Our Territorial governments have powers similar to those which the English colonies in America that had charters, possessed. Mr. Justice BLACKSTONE describes them as "in the nature of civil corporations, with the power of making by-laws for their own internal regulations, not contrary to the laws of England; and with such rights and authorities as are specially given them in their several charters of incorporation. They have a governor, named by the king (or, in some proprietary colonies, by the proprietor), who is his representative or deputy. They have courts of justice of their own, from whose decisions an appeal lies to the king and council here in England. Their general assemblies, which are their house of commons, together with their council

of state, being their upper house, with the concurrence of the king, or his representative, the governor, make laws suited to their own emergencies." 1 Black. Com. 108.

Mr. Justice STORY, in his Commentaries on the Constitution, says of this description, in § 161 : " This is by no means a just or accurate description of the charter governments. They could not properly be considered as mere civil corporations of the realm, empowered to pass by-laws, but rather as great political establishments or colonies, possessing the general powers of government, and rights of sovereignty, dependent, indeed, and subject to the realm of England ; but still possessing within their own Territorial limits the general powers of legislation and taxation."

Again, speaking of the charters given to Massachusetts, he says : " But the charter of William and Mary, in 1691, was obviously upon a broader foundation, and was, in the strictest sense, a charter for general political government, a *constitution for a State, with sovereign powers and prerogatives and not for a mere municipality.*"

He proceeds then to state what the powers given under this charter were, and they are certainly not greater than those possessed by our Territorial government. In pursuing the subject of the governments organized for the chartered American colonies, it will be found, I am sure, that in the main our Organic Act was borrowed from the provisions of the charters of the New England colonies. They are too similar to leave any other conclusion than that the provisions of the former were suggested by the provisions of the latter ; and it should be remembered that these chartered governments were organized by an authority that claimed, and who, it was acknowledged, possessed as unlimited a sovereignty over the colonial dominions, as the United States can be said to possess over the Territories of the United States.

Judge DILLON, in his work on Municipal Corporations, speaks of the free cities of Italy and the hanse towns of Germany, which arose during the " middle ages," and classes them as States, and treats of them as something more than civil corporations having power only to pass ordinances or by-laws. In Hallam's " Middle Ages," it is said of these hanse towns : " They were tacitly ac-

knowledged to be equally sovereign with the electors and princes." Yet the governmental authority possessed by these towns was derived from the rulers, who possessed sovereignty over the country in which they were located. These cities certainly exercised sovereign rights and were treated as capable of entering into treaties and leagues.

The American colonists thought themselves capable of entering into leagues and compacts. Whatever may be said of the power of the general government over the Territories, its right to divide them, to sell them, or to repeal their Organic Acts, may also be said of the power the king of England claimed to exercise and often did exercise over the chartered American colonies, and of the power of the sovereigns in whose realm were located the hanse towns of Europe. Yet it will be found that it has always been claimed that to a certain extent those colonies and those towns were sovereign.

Holding then, as I do, that the Territory of Montana is a government possessing many sovereign powers, or in other words, possesses sovereignty, I come to the question, whether its legislative authority has the power to provide for the forfeiture of land held by aliens to the Territorial government. It is conceded that our legislative power, having adopted the common law, so far as applicable, an alien cannot hold the title to real estate in this Territory; in other words, that that portion of the common law that provides that an alien cannot hold the title to land in a country of which he is not a citizen is applicable. And it may be remarked that there is no law of the United States to this effect, that I am aware of, and that it is only by virtue of this adoption of the common law in this Territory that this disability is imposed outside of the statute under consideration. It follows then that our legislative power can impose this disability. If it can do it in a round-about way, namely, by the adoption of the common law, it can do it directly. What was the object of creating this disability at common law?

Blackstone (1 Com. 372) lays down the rule and reason for it: " An alien born may purchase lands, or other estates; but not for his own use, for the king is thereupon entitled to them. If an alien could acquire a permanent property in lands, he must owe

an allegiance, equally permanent with that property, to the king of England, which would, probably, be inconsistent with that which he owes to his own natural liege lord; besides that, thereby the nation might, in time, be subject to foreign influence, and feel many other inconveniences." Chitty, in his note to this passage, says: "A political reason may be given for this, which, I think, stronger than any here adduced. If aliens were admitted to purchase and hold lands in this country, it might, at any time, be in · the power of a foreign state to raise a powerful party amongst us; for power is ever the concomitant of property." And he proceeds to show how Russia resorted to this very means of acquiring large estates in Poland in furtherance of its covert design, which subsequently became manifested, of conquering and dismembering that now unhappy country. · As I hold that our Territory has the power to suppress insurrection against its laws, to provide for calling out the militia therein, to repel the incursions of hostile Indians into our settlements, or to repel the invasion of any hostile foe who should come within our Territorial limits, I am confident that it does possess the much less power of enacting laws so that no foreign power would be able to raise up a party within our borders hostile to the authority of our government.· It may be said that it is no part of the powers vested in a Territory to protect itself against a foreign enemy, and that this power is vested, by the constitution, in the general government. It has just as much power upon this point as any State in the Union has; and can it be maintained that a State cannot raise troops and marshal them against a foreign foe as well as a domestic one that would seek to conquer and subdue it? To assert that any government cannot do this is to deny the right of self-protection. The States in this Union have ever claimed the right to forfeit the title to real estate purchased by aliens within their borders, and the general government never has exercised that right. The truth is, it makes but little difference upon what grounds the right is based, for the fact is that all *governments* have claimed this right. It is considered a concomitant of government; ·a necessary power. Again, the forming of Territorial governments had, for one of its objects, the building up of a body politic that would eventually be competent to be admitted into

VOL. II. — 20.

the Union as a State. · Now if, in carrying out this object, it is found that a foreign and alien population that the laws of the national government will not allow to become citizens, or an alien population, who, from disinclination, or hostility to our institutions and government, refuses to become citizens, were acquiring such permanent interests in the Territory that they would hinder the settlement of desirable citizens of the United States, and prevent the organization of such a political community as would hinder us from becoming a State in the American Union, it certainly ought to be a rightful subject of legislation, the prevention of this acquisition of such property.

I have treated this subject thus far as though the property vested in an alien must be forfeited to a sovereign power. True, in England, the estate was forfeited on "office found" to the king, in whom is vested the sovereignty. In this country we have no king, and our governments to some extent take the place of kings. It was a provision of the common law that made the forfeiture of such estates to the king. We claim the right to change the common law on most every other subject. Why not upon this? Our legislative authority upon all subjects applicable to our condition, adopts and changes and repeals the common law. This is generally admitted to be within its powers. It ought to have the right to repeal the common law that made the estate vested in an alien subject to forfeiture to the crown, and enact that it should be made to itself, even if it has no sovereignty, for it certainly has the same right of self-protection that a sovereign power has. The question of to whom the forfeiture shall be made is certainly the subject of law. It is not above legislative enactments. I do not think my brother justices would hold that congress might not pass a law saying that the forfeiture need not be made to any sovereign power, but even might be made to a Territory, although it possessed no sovereignty, or to a county. This only shows that this matter is a rightful subject of legislation. And I am unable to see how such legislation interferes with the constitution of the United States, its laws, or the Organic Act of our Territory, or is not a rightful subject of legislation, and these are the only limitations upon our legislative authority. Congress has delegated to the legislative power of the

Territory the right to legislate upon all rightful subjects of legislation.   States legislate upon this subject.   Congress may.   It is certainly a rightful subject of legislation then.   It seems to be contended, however, that the forfeiture cannot be made to the Territory, for the reason that the Territory cannot take the title to real estate.   Our legislative authority passes laws authorizing counties to hold real estate for the purposes of court-houses and jails, and school districts, real estate for the purposes of erecting school-houses.   Undoubtedly the Territory could buy real estate for the purposes of a Territorial capitol, or for erecting a Territorial college, or for any other purpose that was a legitimate object of government.   And it has ever been contended by the English government, and the State governments of this Union, that it is a legitimate province of government to take the forfeiture of real estate vested in aliens, to prevent a foreign power from acquiring the ownership of permanent property in the country. The Territory of Montana, I repeat, is a government, and has the same rights of self-preservation as any other government.   It is contended that the forfeiture must revert to the grantor.   This is not law, " for the vendor is not affected by it, he having resigned his right, and received an equivalent in exchange," is the language of Justice BLACKSTONE (Book 1, page 372).    The doctrine of this court, as I have before shown, is that the general government has parted with this easement, known as a mining claim in this case, and because it has become vested in an alien, it does not re-invest in the general government.   There is no law that authorizes such a rule.   And to show that this is not the law, I have but to state that in the " Western States," where the general government once owned the title to all the real estate, forfeitures are claimed and exacted by the States where real estate becomes vested in an alien. If property conveyed to an alien was held by him for the benefit of the original grantor, this would not be the case.   The general government, as to its title to lands, is considered only as an individual proprietor.

In this discussion, I have only contended for the right of the Territorial legislative authority to pass a law forfeiting real estate acquired by an alien to the Territory.   I do not think it necessary to examine the law under consideration, to see whether it

properly provides for such a forfeiture. My opinion is that it does. The majority of the court have based their judgment upon the ground mainly that the legislative power does not extend so far as to provide for such a forfeiture. I have contended that it does, and that it is a rightful subject of legislation. And I believe that time will fully demonstrate the benefits that would have accrued to this Territory had such legislation been sustained.

NOTE. — The act of the legislative assembly, entitled "An act to provide for the forfeiture to the Territory of placer mines held by aliens," approved January 12, 1872, was repealed by an act approved January 15, 1874. Sts. 8th Sess. 97. — REP.