[No. 561.    September 3, 1894.]

## LINCOLN–LUCKY & LEE MINING COMPANY, PETITIONER, v. DISTRICT COURT, SITTING IN THE FIRST JUDICIAL DISTRICT, TERRITORY OF NEW MEXICO, RESPONDENT.

[No. 558.    September 3, 1894.]

## W. P. CUNNINGHAM, PETITIONER, v. BOARD OF COUNTY COMMISSIONERS OF SANTA FE COUNTY, RESPONDENT.

PROHIBITION, WRIT OF—POWER OF SUPREME COURT TO ISSUE—VALIDITY OF SECTION 2006, COMP. LAWS, 1884.—It was not the intention of congress by section 1912 of the Revised Statutes of the United States, providing that, "The supreme and district courts of each territory, and the respective judges thereof, except for Idaho and Montana, may grant writs of habeas corpus in all cases in which the same are grantable by the judges of the United States in the district of Columbia," to limit the original jurisdiction of the supreme court of this territory to such writs, but rather to prevent any territorial legislation which might deprive this court of the power to issue the writ. Even though the original jurisdiction of this court were limited, by said section, to writs of habeas corpus, section 2006, Compiled Laws, authorizing the court to issue writs of prohibition, is not in conflict therewith, the granting of writs of prohibition being the exercise of an appellate rather than an original power.

ID.—ISSUANCE OF PRELIMINARY WRIT BY JUDGE OF SUPREME COURT IN VACATION.—Nor is section 2006, Compiled Laws, providing that a judge of the supreme court may issue a preliminary writ of prohibition in vacation, in conflict with the act of congress declaring that three judges of such court shall constitute a quorum.

ID.—PLEA TO JURISDICTION OF INFERIOR COURT NOT NECESSARY, WHEN.—Where the court below had no jurisdiction of the original subject-matter, it is not necessary to plead to its jurisdiction as a foundation for the writ of prohibition.

ID.—ISSUANCE OF WRIT TO DISTRICT COURT—SUPERINTENDING CONTROL OF SUPREME COURT.—The supreme court of this territory is a superintending, appellate court, and may in the exercise of its relative powers as such, issue writs of prohibition to the district courts of the territory, which, though not "technically" so, are "relatively" inferior courts. Rev. Stat., sec. 1869; Clough v. Curtis, 134 U. S. 361.

ID.—POWER OF ASSOCIATE JUSTICE OF SUPREME COURT TO ISSUE WRIT TO ANOTHER ASSOCIATE JUSTICE.—Section 2006, Compiled Laws, conferring upon an associate justice of the supreme court the power to issue a writ of prohibition in vacation to another associate justice, sitting as a judge of the district court, is not only constitutional, but operative in its broad sense, since, by the terms of the statute, there is no attempt to exclude any court from the operation of the writ. It acts only as a preservative of the status quo, and is not finally disposed of until term time, by a quorum of the full bench in open court, and will go to a district court of the territory under the relative superintending, appellate power of the supreme court.

ID.—POWER OF SUPREME COURT JUDGE TO ISSUE WRIT TO BOARD OR QUASI JUDICIAL TRIBUNAL.—The preliminary writ of prohibition may also be issued by a judge of the supreme court of the territory in vacation to a board or officer exercising judicial or quasi judicial functions.

ID.—ISSUE OF PRELIMINARY WRITS OF PROHIBITION BY SINGLE JUDGES OF SUPREME COURT IN VACATION TO DISTRICT COURT, AND BOARD OF COUNTY COMMISSIONERS.—On application to make absolute and final two preliminary writs of prohibition issued during vacation by two of the judges of the supreme court respectively, and made returnable to the regular term of the court,—one to restrain the board of county commissioners of Santa Fe county from ousting the petitioner from the office of sheriff of said county, on the ground that they had no jurisdiction in the premises by reason of the repeal of the statute under which they claimed to be acting; and the other to restrain the district court of the First Judicial District, sitting for the trial of causes arising under the laws of the United States, from proceeding with a certain cause upon said docket, the petitioner relating that said cause originated in the court sitting in Santa Fe county for the trial of causes arising under the laws of the territory of New Mexico, the amici curiae contending (no return being made to either writ) that, granting the power to issue the preliminary writ, and that it would go either to the district court or to the board of county commissioners, the writ was improvidently issued,—Held: The preliminary writ of prohibition issued providently in both causes, and should be made absolute in each.

PETITION for writs of prohibition, one by the Lincoln–Lucky & Lee Mining Company to the district

court, sitting in the First Judicial District, for the trial
of causes arising under the laws of the United States;
and the other by W. P. Cunningham to the county
commissioners of Santa Fe County.   Preliminary writs
made absolute in each cause; Freeman, J., dissenting.

The facts are stated in the opinion of the court.

H. L. WARREN and FRANCIS DOWNS for relators.

T. B. CATRON and EDWARD L. BARTLETT, solicitor
general, amici curiae, for respondents.

FALL, J.—These cases present for our consideration
several important questions, common to both, as to the
power of this court to issue the writ, while radically
differing in respect to the issues involved upon the
merits and as to the officers and courts to which the
writs are directed.   In 558, W. P. Cunningham, peti-
tioner, relates that he is the duly appointed, qualified,
and acting sheriff of Santa Fe county; that without
warrant of law the board of county commissioners of
said county are proceeding to oust him from said office,
the said board possessing no jurisdiction in the premises,
by reason of the repeal of the territorial statute under
which they claim to be acting.   The petition was pre-
sented to Associate Justice NEEDHAM C. COLLIER, and
the writ issued, returnable to this regular term.   In
561, the Lincoln-Lucky & Lee Mining Company applied
for a writ from Associate Justice ALBERT B. FALL, to
restrain the district court of the First judicial district,
sitting for the trial of causes arising under the laws of
the United States, from proceeding with the trial of a
certain cause upon said docket, petitioners relating that
said cause originated in the court sitting in Santa Fe
county for the trial of causes arising under the laws of
the territory of New Mexico, and upon application of
each party thereto, having been changed from one

county to another of said district, was finally by order of Associate Justice Edward P. Seeds, under section 3 of chapter 77 of the Acts of the Territorial Legislature of 1889, changed to said district court sitting for the trial of causes arising under the laws of the United States within said First district aforesaid. Said writ was issued as prayed for, returnable to this regular term. The writs were issued under section 2006 of the Compiled Laws of the Territory of 1884, which is as follows: "2006. Writs of prohibition shall only be issued·out of the supreme court and shall be applied for upon affidavit, by motion to the court or a judge thereof in vacation, and if the cause shown appears to the court or judge to be sufficient a writ shall be thereupon issued, which shall command the court and party, or officer to whom it is directed, to desist and refrain from any other proceedings in the action or matter specified therein, until the next term of said supreme court, or the further order of the court thereon; and to show cause at the next term of said court, or some day to be named in the same term at the option of the court, if issued in term time, why they should not be absolutely restrained from any further proceedings in such action or matter." No return whatsoever was made to either of said writs, but due hearing was had here, as though the allegations in the respective petitions had been traversed by a regular return to the writ; T. B. Catron and Solicitor General Bartlett being granted leave, upon their application, to act as amici curiae for the purpose of presenting the respondents' side of the question; Messrs. H. L. Warren and Francis Downs appearing for relators. The objections submitted by the amici curiae are: (1) Has this court the power to issue the writ of prohibition? (2) If so, can the preliminary writ be issued by an associate justice in vacation? (3) Granting the power to issue the writ, would it go either to the district court or to the board of

county commissioners? (4) Granting the power to issue, and that it would properly issue to the courts or officers in this instance, was the writ providently issued?

Upon the first of these propositions numerous authorities are quoted, and before answering the objection it will be necessary for us to consider the history of the writ both at the common and under statutory law, as well as, and together with, the organization of this court under acts of congress creating the same and fixing the power of the territorial legislature to legislate for the courts of this territory. "The injury which is that of an encroachment of jurisdiction, or calling one 'coram non judice' to answer in a court that has no legal cognizance of the cause, is also a grievance for which the common law has provided a remedy by the writ of prohibition." Bl. Com., bk. 3, p. 112. Originally, or at least properly, this writ, being the king's prerogative, issued only out of the court of king's bench, the supreme court of common law, the legitimate successor of the "Aula Regis." This court possessed jurisdiction to keep all inferior jurisdictions within the bounds of their authority, to superintend all civil corporations, to command magistrates and others to do what their duty requires, to protect the liberty of the subject by speedy and summary interposition, and to take cognizance of both civil and criminal causes, as also to hear appeals from all determinations of the court of common pleas and of all inferior courts of record. Afterward the writ issued out of the court of common pleas or common bench, the court of exchequer, and the chancery court,—the first inferior to the court of king's bench, and with jurisdiction in real actions and "all other pleas between man and man," both original and appellate; the second (the exchequer) inferior to both the king's bench and common bench, originally only possessing jurisdiction to adjust and

*WRIT of prohibition: power of supreme court to issue: validity of sec. 2006, Comp. Laws, 1884.*

review the king's revenue, "but now, by a fiction, with jurisdiction in all kinds of personal actions." See Id. 3, p. 110, et seq. The writ also issued out of the courts of law in Chester, to the spiritual court there, although the king's bench or common bench could issue the writ to the same court; also from the court of great sessions in Wales to the spiritual court. See 8 Bac. Abr., p. 227, et seq.; 7 Com. Dig., p. 137, et seq.; 17 Vin. Abr., p. 547; 14 Petersd. Abr., p. 61. This writ "issues out of the superior courts of the common law to restrain inferior courts, whether such courts be temporal, ecclesiastical, military or maritime. * * * Prohibitions do not import that the ecclesiastical or other inferior courts are alia than the king's courts, but signify that the cause is drawn ad aliud examen than it ought to be." 14 Petersd. Abr., p. 61. "The king's superior courts of Westminster have a superintendency over all inferior courts, of what nature soever." 8 Bac. Abr., p. 227. "The superior courts of Westminster grant prohibitions to inferior courts where the latter assume jurisdiction belonging to another inferior tribunal." Id., p. 229; 14 Petersd. Abr., p. 65. Thus we see that these courts, i. e., the courts of Westminster, king's bench, common bench, and exchequer, had a superintendency over other courts of common law, as well as ecclesiastical, military, etc.; second, that these courts issued the writ both when they claimed jurisdiction of the question themselves, and also when the court to which it was issued had no jurisdiction, while another inferior court possessed it.

Great conflict of opinion has arisen as to whether the power to issue the writ of prohibition, when the same was possessed beyond question, arose from the original jurisdiction of the court or from its superintending, appellate, controlling power; but, so far as we of this court are concerned, the question has been settled beyond cavil. "To control in this manner the

proceedings of these tribunals [courts appointed under the authority of the United States] is but the exercise of appellate power." Conk. Pr., p. 48. "The judicial power is abstract or relative. In the latter power it superintends and controls the conduct of other tribunals by a prohibitory or mandatory interposition." U. S. v. Peters, 3 Dall. 123. The constitution in absolute terms limits the original jurisdiction of the United States supreme court—first, to cases affecting ambassadors or other public ministers and consuls.; and, second, to causes in which a state shall be a party; but it also declares that it shall have "appellate jurisdiction both as to law and fact." * * * Section 688 of the judiciary act gives to the supreme court power to issue writs of prohibition to the district courts of the United States in maritime and admiralty cases. This, were it an attempt to confer an abstract power, might be in conflict with the constitution, but, as conferring a relative power to a superintending, controlling, appellate court, is constitutional. Section 1907, Revised Statutes, United States, provides that: "The judicial power in New Mexico * * * shall be vested in a supreme court, district courts, probate courts, and in justices of the peace." Section 1869 provides that: "Writs of error, bills of exceptions and appeals shall be allowed, in all cases, from the final decisions of the district courts to the supreme courts of all the territories respectively." * * * Section 1864 provides that: "The jurisdiction, both appellate and original, of the courts provided for in section 1907 * * * shall be limited by law." Section 1851: "The legislative power of every territory shall extend to all rightful subjects of legislation not inconsistent .with the constitution and laws of the United States," etc. Section 1912: "The supreme and district courts of each territory, and the respective judges thereof except for Idaho and Montana, may grant writs of habeas corpus

in all cases in which the same are grantable by the
judges of the United States in the District of Columbia.''
Section 1868: ''The supreme court and the district
courts respectively of every territory shall possess
chancery as well as common law jurisdiction.'' The
acts of congress stand to us as a constitution. Our
legislature can no more infringe upon a congressional
enactment applicable to this territory than could the
congress of the United States enact a valid law in con-
flict with the constitution. We have, however, here a
system of courts provided for, with power delegated to
the territorial legislature, as has been decided again
and again, to put these courts in motion, and to pre-
scribe rules of practice and decision, etc., not in con-
flict with the organic act or acts of congress. We have
a supreme court with controlling appellate, superin-
tending power, and with both common law and chancery
jurisdiction conferred by a grant as solemn as would
be the article of a state constitution. But it is claimed
that the permission given in section 1912 (infra) to this
court to grant writs of habeas corpus is a restrictive
grant of original jurisdiction, and must be construed to
prohibit the exercise of original jurisdiction in any other
cause or proceeding. Territory v. Ortiz, 1 N. M. 12,
would seem to sustain this contention, but would it not
appear that the intention of congress was rather to
prevent any territorial legislation which might deprive
this court of the power to issue the writ than to limit
its original power to habeas corpus alone? Again, it
would be a reductio ad absurdum if we followed this
argument to its natural conclusion and decided that the
original jurisdiction of district courts of the territory
was to be limited to these writs. Yet the permission
to issue writs of habeas corpus is given to the supreme
court and judges and the district court and judges in
the same section and by the same words. We think
that the eminent counsel who have so ably discharged

their duty as amici curiae have confounded the abstract and relative powers of the judiciary, and that the act of the territorial legislature (section 2006) is no more in conflict with the acts of congress relative to our courts than is section 688 of the judiciary act in conflict with article 3 of the constitution; indeed, not so much so, because, by the constitutional provision referred to, the original jurisdiction of the supreme court of the United States is limited in terms; here the only limitation claimed is by implication. We might go further, and consider the question as to whether the inherent power of this, as an appellate court of common law and chancery jurisdiction, would not extend to the issuing of prohibitory and mandatory writs; but this is unnecessary. See, however, Reese v. Lawless, 4 Bibb (Ky.), 394. As to this objection, we will only cite, further, Clough v. Curtis, 134 U. S. 363.

As to the second proposition, it follows from our decision as to the first that, the legislature having power to provide for the issuing of the writ, it certainly has power, unless conflicting with an act of congress, to prescribe the rules for its issuance. It is contended that the act of congress establishing the Fifth judicial district, and providing that three of the judges of the supreme court should constitute a quorum, is such an inhibition. We find that under the law as laid down in all the old writers the court of chancery might award a writ of prohibition in vacation. Petersd. Abr., p. 65. The question might be a much more serious one if these were causes in which it was admitted that the courts, or court and board, had jurisdiction originally of the respective causes sought to be prohibited, and that the writ was asked to restrain their then proceeding without their jurisdiction. But the whole contention here is the want of original jurisdiction, and in such a case the issuing of the preliminary writ is even more in the

ISSUANCE of preliminary writ of prohibition by judge of supreme court in vacation.

nature of a ministerial act.   It could not be contended that a person can be deprived of his property but by due process of law, and yet we see, every day, judges of this court, upon ex parte applications showing a prima facie case, issuing temporary restraining orders, as injunctions, which, for the time, have exactly the effect of depriving the owner of the use of his property, etc.   The writ in these cases did no more, nor sought to do more, than prevent a court, which it was claimed possessed no jurisdiction, from acting, leaving the parties in statu quo, not in any manner disturbing their relations, but, on the other hand, perserving them until the matter could be heard on the merits.   See Sharp v. Weeks, 93 Mo. 499.

We will now consider the third proposition, and the task has been somewhat lightened by what has already been said in discussing the first and second. It is contended that the district courts of this territory are not courts of inferior jurisdiction, and that the writ, under Smith v. Whitney, 116 U. S. 167, will not issue to them,—this in cause 561.   It is further objected that the writ will not issue in number 558—First, because the board of county commissioners is not a judicial body; and, second, because no objection was taken below to the exercise of jurisdiction by the board.   As to the last, we can not consider that matter here.   No return has been made to the writ, and this hearing is had upon the petition alone, is entirely informal, and not had as a matter of right, but merely as an accommodation to the worthy amici curiae who appeared below, it seems, for parties interested, and as settling the law and practice.   We may say, however, that it is only necessary to plead to the jurisdiction below as a foundation for the writ where the lower court had jurisdiction of the original subject-matter.   See U. S. v. Peters, 3 Dall. 123; Miller, Const. 427; In re Cooper, 138 U. S.

*PLEA to jurisdiction of inferior court not necessary, when.*

404; 14 Petersd. Abr., p. 78.    To go back to the law of England, we find that the writ will issue to the court of chancery of Chester, to the court of the marches of Wales, to the grand sessions of Wales, and in fact to any inferior court, by usurpation without lawful authority (7 Com. Dig. 137, 138); also to the court of exchequer, and to the court of common bench; in fact, to any but the great court of king's bench; and to common bench it goes to the judges (Id. 139; 17 Vin. Abr., p. 547).    The writ goes from the supreme to the district courts of the United States.    Rev. Stat., sec. 688.    And our district courts have the same jurisdiction as these last.    Id., sec. 1868.    Being an exercise of the relative judiciary power, the superintending, appellate power, it also goes from the supreme court of the United States to the district court for the territory of Alaska, although the statute only directs it to the district courts of the United States.    In re Cooper, 138 U. S. 404.    The contention that our district courts are not inferior courts is well founded in the technical sense in which this term is used; but, bearing in mind the distinction between the "abstract" ("apart or separate from something else") power of the judiciary and the "relative" ("having reference to," "not absolute or existing by itself") power, we can then see that in the sense in which the term "inferior" is applied to courts to which the writ of prohibition will issue it is meant to convey the meaning of "relatively inferior." The district courts of the United States are not technically "inferior" courts, and yet their attempted exercise of power without their jurisdiction can be prohibited by a court to which they are relatively inferior. The supreme court of this territory is a controlling, superintending, appellate court.    Rev. Stat., sec. 1869. Our district courts are not technically "inferior" courts, but are relatively inferior to this superintending tribu-

ISSUANCE of writ of prohibition to district court: superintending control of supreme court.

nal, and in the exercise of its "relative" power this court can properly issue the writ to them.  See Clough v. Curtis, 134 U. S. 361.

It is strenuously argued that section 2006 of the Compiled Laws of New Mexico, conferring upon an associate justice of the supreme court power to issue the writ to another associate justice, his equal in power, is an unwarranted interference, subject to abuse, and might be carried to such an extent as to paralyze the business of the courts. The writ issues out of the supreme court as other writs issue from this tribunal, and is directed to a relatively inferior court.  The same argument might be made with reference to the writ of injunction, the writ of mandamus, etc., out of the district courts.  In fact, it would equally apply to any extraordinary writ or remedy as a reason why extraordinary writs should never be issued.  But we must bear in mind that the writ acts only as preservative of the status quo, and is not finally disposed of until term time, and by a quorum of the full bench in open court. It might be best to provide by legislation that the writ should only issue out of the court in term time, but the legislature evidently had in mind that only one term of this court is held in twelve months, and that grave injury might result from delay.  By the terms of our statute, there is no attempt to exclude any court whatsoever from the operation of the writ.  This statute, then, is not only constitutional, but operative in its broad sense, and the writ will go to a district court under our relative superintending, appellate power. The objection to the issuing of the writ to the board because not a judicial body or tribunal appears not to be insisted upon.  We may say, however, that the record in this case—i. e., the petition and order—show that the board of county commissioners had cited

*POWER of associate justice of supreme court to issue writ to another associate justice.*

Sheriff Cunningham to appear before them and show cause why he should not be removed. Undoubtedly POWER of supreme they supposed themselves to be acting as a court judge to issue writ to quasi judicial tribunal at least, and under board or quasi judicial tribunal. the citation they were undoubtedly ·so attempting to . act. The law is well settled that the writ will issue to a board or officer exercising judicial or quasi judicial functions. High, Extr. Rem., secs. 769, 782.

We will next consider the question as to whether the writs issued providently. There being no return to the writ in either case, it would not be necessary to dwell upon this question in arriving at a conclusion in the causes, but we are desirous that the law, as we understand it, shall be settled definitely. It is settled ISSUE of prelimi- at common law as well as by our statute nary writs of prohibition by that the writ will issue directly to the single judges of supreme court in court or officer, and where the sole ques- vacation to dis- trict court, and tion is, as here, the want of original juris- board of county commissioners. diction in the court or officer, we do not think it necessary to make the parties to the original proceeding parties to the writ. Id., 768, 774. Section 1865, Revised Statutes, United States, provides: "Every territory shall be divided into three judicial districts; and a district court shall be held in each district of the territory by one of the justices of the supreme court, and at such time and place as may be prescribed by law," etc. Section 1874: "The judges of the supreme court of each territory are authorized to hold courts within their respective districts, in the counties wherein, by the laws of the territory, courts have been or may be established, for the purpose of hearing and determining all matters and causes, except those in which the United States is a party;" and proceeds to provide that the expenses of holding such courts shall be borne by the territory or by the counties, etc. Section 1851, as heretofore seen, provides that the legisla-

tive power of the territory shall extend to all rightful
subjects of legislation not inconsistent with the consti-
tution and laws of the United States; section 1864 that
the jurisdiction of the courts mentioned in section 1907
(supreme, district, probate, and justices of the peace)
shall be as limited by law; and section 1910, that each
of the district courts shall have and exercise the same
jurisdiction as district and circuit courts of the United
States in all cases arising under the constitution and
laws of the United States.   Section 1874, Revised
Statutes, was passed June 14, 1858.   Up to this time
the courts provided for in section 1907 (organic act)
exercised jurisdiction in causes arising under the laws
of the United States and under the laws of the territory,
the two jurisdictions being, as it were, concurrent, or
at least exercised by the same court.   In January, 1859,
the legislature of the territory, under the power dele-
gated to it by said section 1874, Revised Statutes, pro-
vided for separate courts to be held in the counties for
the trial of causes arising under the laws of the terri-
tory (chapter 6, Sess. Acts, 1859), and by chapter 10,
same acts, under the title, "An act relative to practice
in the district courts," remanded from the district
courts of the several judicial districts to the district
courts for the counties the causes not pending in said
judicial district courts under the laws of the United
States.   By chapter 19 a jury law was enacted for the
county district courts.   By chapter 25, approved Feb-
ruary 3, 1859, the time for holding said county district
courts was fixed.   Thus we see that at the first session
of the territorial legislature after the passage of the act
of June 14, 1858, advantage was taken of the pro-
visions of the latter, and the jurisdiction of the district
courts of the territory separated, to remain separate
through all subsequent legislation; the courts for the
trial of causes under the laws of the United States
being designated as "judicial district courts," and those

for the trial of causes under the laws of the territory being called "district courts for the counties." Distinct juries were provided for; the office of clerk of the United States side and clerk of the territorial side distinguished by provisions for the pay of the latter, etc.; the sheriff acting as officer of the court in the one, the marshal in the other; writs in the one running in the name of the United States and in the other in the name of the territory; in fact, the machinery of the courts differs in its construction, and is operated by distinct forces, except that both are presided over in the respective judicial districts by the one judge of each. It will not be questioned that congress, instead of giving permission to the territorial legislature to establish these courts, could have established them directly. If the latter had been the course pursued, would not any court in the land have construed the intention of congress to have been to create county courts, and confer upon them jurisdiction in territorial causes, leaving to the three, or, as we have it now, five, district courts, the jurisdiction to try causes arising under the laws of the United States, separating the jurisdictions?

This, as we construe it, is the decision of the United States supreme court in Ex parte Bradley, 7 Wall. 371, where that court declared the act of July 7, 1838, establishing a criminal court in the District of Columbia, to have divested the circuit court of the district of its criminal jurisdiction. It is the rule that the jurisdiction of superior courts will not be taken away by statute, except by direct words or by necessary implication; but it has been repeatedly declared in the construction of statutes that every statute is by implication a repeal of all prior statutes, so far as it is contrary and repugnant thereto. Sedg. St. Const., p. 104. "So, on the same principle, a statute is impliedly repealed by a subsequent one revising the whole subject-

matter of the first." Section 1874, Revised Statutes, did not "revise" the whole subject-matter of the former sections providing for district courts, conferring upon them the jurisdiction in United States cases as that of district and circuit courts of the United States, and declaring that the first six days of the term should be devoted to United States business; but it did "revise" the whole subject-matter of the act of 1850 with reference to the place and tribunal for trial of territorial cases, subject only to the putting of the machinery in motion by the territorial legislature, which, as we have seen, was done at once, and has been adhered to from January 20, 1859, to the present day. Clearly, the intention of congress evinced by the passage of section 1874, Revised Statutes, was to provide for the creation of courts in the territory which should have jurisdiction in causes arising under the laws of the territory, as we have said before, and, these courts having been put in motion, by necessary implication the jurisdiction to try such causes was taken from the judicial district courts and conferred upon the "district courts for the counties." By operation of law, jurisdiction in these territorial causes passed from the former to the latter courts, and so long as these courts remain as at present constituted the jurisdiction of each is limited to its own particular business as established by statute, and these jurisdictions are in no sense concurrent, except as is the jurisdiction of state courts and district and circuit courts of the United States within the state. See 12 Am. and Eng. Encyclopedia Law, p. 304, note 1.

The acts of congress relative to this territory stand as our constitution. The act of the legislature in creating the district courts for the counties and giving them exclusive jurisdiction in territorial causes is simply the putting in force of this fundamental constitutional law. Ponder v. Graham, 4 Fla. 23; In re

Church, 92 N. Y. 1. In Leitensdorfer v. Webb, 20
How. 182, which went up from this territory, upon the
construction of the organic act of 1850, Mr. Justice
DANIEL, delivering the opinion, says: "It was un-
doubtedly within the competency of congress either to
define directly by their own act the jurisdiction of the
courts created by them, or to delegate the authority
requisite for that purpose to the territorial government,
and by either proceeding to permit or to deny the
transfer of any legitimate power or jurisdiction pre-
viously exercised by the courts of the provisional
government to the tribunals of the government they
were about to substitute for the territory, in lieu of the
temporary or provisional government." Certainly the
same power extended to the divesting from the courts
of the act of 1850 and the conferring upon the courts
by the act of 1858 exclusive jurisdiction in territorial
causes, and, this having been done, we think that
any attempt to revest the former courts, now courts
solely of federal jurisdiction, with powers to try terri-
torial causes, the act of 1858 being in full operation, is
an attempt to confer an abstract jurisdiction upon the
former which could not be sustained as a proper exer-
cise of legislative power. Ferris v. Hihley, 20 Wall.
375. Indeed, prior to the passage of the act of 1858,
the business—i. e., the territorial and United States
business—of the courts of 1850 had been regarded by
the supreme court of the United States as separate.
See Snow v. U. S., 18 Wall. 322. This court recog-
nized the distinction in Territory v. Yarberry, 2 N.
M. 450, although the construction of the statute of
1858 was not considered. In Ex parte Crow Dog, 109
U. S. 560, Mr. Justice MATTHEWS, speaking of the
district courts of Dakota (the jurisdiction, territorial
and United States, not having been separated by act
of territorial legislation), says: "The district court has
two distinct jurisdictions. As a territorial court, it

administers the local law of the territorial government; as invested by act of congress with jurisdiction to administer the laws of the United States, it has all the authority of circuit and district courts of the United States." Even in Clinton v. Englebrecht, 13 Wall., the distinction in the two jurisdictions is recognized. Again, in Hornbuckle v. Toombs, 18 Wall. 656, the two distinct jurisdictions are recognized, and the fact that a portion of the term, where the jurisdictions are exercised by the same court at the same time, is set aside to the United States business, under the act of congress heretofore referred to, is there commented upon. If the jurisdiction of the district courts of this territory had not been separated by the legislature in accordance with the provisions of section 1874 of the Revised Statutes, where would the records of our courts go upon the admission of this territory as a state? To the state courts? Clearly not all the records, because the state courts would not have cognizance of United States causes pending; and as clearly only the federal cases would go, under section 529, Revised Statutes, to the district or circuit court of the United States. Hunt v. Palao, 4 How. 589. "When a territory becomes a state, the records of the courts of the territory are transferred to the new state courts and to the federal courts respectively, the judicial proceedings existing in the courts of the territory being continued by federal law in the respective state and federal courts." Mr. Justice FIELD, in McAllister v. U. S., 141 U. S. 199. So we must agree that, while the two jurisdictions might have been exercised by identically the same courts and officers under the act of 1850, nevertheless these jurisdictions remained separate and distinct, and never became blended.

Now, let us see what was the condition as to the exercise of these jurisdictions, by what courts, etc., when the question involved in number 561, at bar,

arose. In 1889 the legislature of this territory, by session act (chapter 96), attempted to provide a new jury law and system for the district courts of the territory. By the provisions of this act the jurors of the district courts for the counties, sitting for the trial of causes arising under the laws of the territory, were generally to be drawn from the counties, but in the counties of Santa Fe, San Miguel, Bernalillo, and Dona Ana, where courts for the trial of causes arising under the laws of the United States were held for the respective districts (in each case composed of more than one county), it was provided that the grand and petit jurors selected for the said United States courts should have power respectively to examine into and try territorial causes for the county in which such courts were held; that is, the grand and petit jurors for the United States court of the First district should also act as grand and petit jurors for territorial causes in the county of Santa Fe, the two courts to be held at the same time, but with their respective officers in attendance upon each, etc. The intention of the legislature was not left to construction, but by section 4 of the act was expressed as follows: "It being the true meaning and intention of this act to provide for but one grand and petit jury in counties where causes arising under the laws of the United States are triable," etc. At the same session a "change of venue" act was passed, by section 3 of which it was provided that " * , * * the cause shall be removed either to some other county free from exception within the same judicial district, or to the district court of such judicial district sitting for the trial of causes arising under the constitution and laws of the United States, which court is hereby given jurisdiction to try and determine all causes so removed." Laws, 1889, ch. 77. It will readily be seen that the intention of the legislature was that this section 3 should run hand in hand with sec-

tion 4 of chapter 96,—the jury law referred to. It will also be seen that this was an attempt of the legislature to reinvest the federal judicial district courts with jurisdiction of which they had been deprived by the acts of 1859, and subsequent acts of the legislature in carrying out the provisions of section 1874, Revised Statutes; while from a careful perusal of the section it further appears that the legislature regarded this as an act for the "removal of causes." From what has been already said, it follows that we must regard this change of venue act as null and void, in so far as it attempts to confer an abstract power upon a court ·which had been deprived by absolute legal statutory enactment, as well as by necessary implication and operation of law, of jurisdiction in territorial causes. If the district courts for the counties had been abolished by law, the jurisdiction might have been reinvested by operation of law in the judicial district courts; but, being in full operation, no such reinvestment of jurisdiction could operate by a legislative enactment. Further, two classes of courts having been established, the one federal, and the other territorial, an act of the territorial legislature for the removal of causes from the one to the other is unconstitutional, and such a statute could only be made valid by an affirmative act of congress. See Greely v. Townsend, 25 Cal. 604; U. S. v. Peters, 5 Cranch. 115.

Another objection to the attempted enforcement of this change of venue act is as fatal, in our judgment, as those above given. The jury act of 1889 was attacked in the district court of the First district, in what were known as the "Ortiz Cases," which came to this court, and here, in an able opinion by Associate Justice FREEMAN, the law as to territorial causes in all the courts was held special, and in conflict with the act of congress of 1886, known as the "Springer Act." Following this opinion, the legislature of 1891 adopted

the jury law now in force, providing separate and dis-. tinct juries, grand and petit, for the judicial district courts of the several districts, and the county district courts held with them; jurors in the first instance being selected and summoned from all the counties of the district, and in the second from the county alone. The jurors for the federal courts are summoned and impaneled to try only United States causes; those for the county district court, for the trial only of territorial causes. Can it be maintained that when the jury law of 1889 fell, and was replaced by that of 1891, that portion of the change of venue act of 1889, founded upon this very jury law, did not fall with it? Yet we have in the case at bar an attempt of the judge of the First district to transfer a case arising strictly under territorial statute, brought originally on the territorial side of the court in Santa Fe county, and changed to other counties in the district, over to the court of the First judicial district, sitting for the trial of causes arising under the laws of the United States, placing it upon the United States docket, issuing process to the United States marshal, the clerk charging fees to the United States government, the jury to try the cause selected under the laws of 1891 for the trial of federal causes. This is an anomaly in practice and procedure such as is without parallel in the history of the courts of this or any other country, so far as our research discloses.

It is contended, however, that the writ issued improvidently in this cause, for the reason that an appeal would lie. If the court had no jurisdiction of the cause, a verdict and judgment would have been a nullity. Should we compel a party to appeal—granting that such would lie—from a void judgment, giving bond, suing out writ of error, and bringing up a cause here upon appeal, when we could only declare that the judgment below was no judgment? A stipulation was read

in this cause, by which it is shown that another cause
is pending below, to be disposed of as is this cause.
That is a quo warranto involving title to office, and it
is strongly contended that no supersedeas goes from
the decision of the court in such a cause. Granting
this, upon appeal the party would be ousted from office;
and with his appeal here would, as his only recourse, be
coupled the right to sue for trespass, the officer attempt-
ing to execute a void, illegal order of a court coram
non judice. Prohibition in this cause affords the most
speedy, adequate, and satisfactory remedy, and in our
opinion, is the proper proceeding. See 3 Dall. 123; In
re Cooper, 138 U. S. 404. We are therefore of the
opinion that the preliminary writ of prohibition provi-
dently issued in the causes at bar, and that the same
should be made absolute in each case. It is so ordered.

SMITH, C. J., and COLLIER, J., concur.

LAUGHLIN, J.—I agree fully in the foregoing opin-
ion, but can not concur, because I was of counsel in the
case of Conklin v. Cunningham, which, by stipulation,
is determined by this case.

(September 4, 1894.)

FREEMAN, J. (dissenting).—The conclusion reached
by the majority of the court in this case is that one of
the judges of the supreme court of this territory may,
at chambers, upon ex parte application of a party to a
litigation, issue his fiat to another judge presiding in
open court, in the trial of a cause, commanding such
judge forthwith to adjourn the hearing of said cause.
It follows as a corollary that the refusal of the judge
thus commanded to obey the mandate of his brother
judge would subject him to the pains and penalties of
fine and imprisonment as for contempt. The effect of
this proposition is sufficiently startling to invite an

earnest inquiry into the sources of its origin and the
propriety of its existence.   It may explain, but it does
not justify, this pretension, to say that it rests upon a
fiction that the writ issues in the name of the supreme
court.   It is in fact and in law, however, a fiat issued
by one judge out of chambers commanding a brother
judge in open court to adjourn an investigation about
which he is presumed to know at least as much as the
judge who undertakes to command him to desist.   In
stating the reasons why I can not agree in this conclu-
sion I shall not undertake to trace minutely the origin
and history of the writ of prohibition.   My Brother
FALL, with his usual clearness, has given us a very fair
history of the writ.   I may be permitted, however, to
add one or two suggestions afforded by the earlier
adjudications.   There is one proposition which consti-
tutes the touchstone by which the jurisdiction exercised
through the medium of this writ can always be tested.
It is the thread that enables us to trace with safety the
otherwise impenetrable labyrinth of this the most extra-
ordinary of all the writs known to the common law.
It is this.   That it is never allowed to serve the purpose
of appeal, writ of error, or certiorari, or any other proc-
ess known to the common law by which the action of
an inferior court may be reviewed.   Of all the extra-
ordinary writs known to the law it is the most extraor-
dinary.   It may with propriety be said that the writs
of injunction and mandamus, formerly characterized
as extraordinary writs, are no longer to be regarded as
in that category.   The leading distinction between the
last writs mentioned and the writ of prohibition is that,
while the former operate upon parties, laying its hand
upon them, and enjoining certain duties, the latter, as
a writ, operates upon a court.   It is the means by
which one court lays its hand upon another court.   It
is a contest for jurisdiction, going only from a superior to
an inferior court, operating not as a writ of review, but

emanating from one to the other as a command, or, as its name implies, an absolute prohibition. It would be more interesting than profitable to trace the history of its application in the earlier English decisions. It may, however, suffice to say that it had its origin in a contest between the temporal and spiritual courts. It was the weapon seized upon by the English common law courts to prevent encroachment upon their jurisdiction by the spiritual courts. It is very true, as stated in the opinion of the majority, that it came into more general use afterwards; but it is to be observed that it never rose above the character which marked its origin, —that is, it was never allowed to serve the purpose of an appeal, and was never resorted to except in those cases in which an appeal would not lie.

Having indicated a purpose not to institute a tedious inquiry into the nature and origin of the writ, it is nevertheless interesting, even instructive, to note some of the principles that gave rise to its application in the earlier adjudications. I have already observed that it had its origin in a contest waged between the spiritual and temporal courts. It is curious to note some of the very fine distinctions that were drawn in the matter of the respective jurisdictions of these two courts. We are told by Viner in his abridgment that on the trial of a cause in which one man had said to another, "Thou art a knave, a paltry knave, and a pocky-faced knave," the writ of prohibition lay to the spiritual court, for the reason that such language was actionable at common law; and that in another case, where one man had said to another, "Thou art a cuckoldy knave," an action brought for these words by the slandered man and his wife could not be prohibited, "because the words amounted to a spiritual defamation," to wit, that the wife was incontinent. 17 Vin. Abr. 592. It is also to be observed that the writ was a prerogative writ. It went in the name of the king, and any one

could move for it, whether a party or a mere stranger, the purpose being to prevent inferior courts from usurping jurisdiction in matters which pertained to other courts. 14. Petersd. Abr. 65; 3 Bl. Com. 112. As has been observed already, however, the writ did not issue if the action of the inferior court could be reviewed upon appeal. 17 Vin. Abr. 600. Before the writ could issue, it must not only be made to appear that the action of the court sought to be prohibited could not be reviewed upon appeal, but it was necessary to show that the question of jurisdiction in the court below or inferior court had been set up by plea. 8 Com. Dig. 889; 13 Wis. 338.

Having determined that the writ had its origin, not in an effort upon the part either of the common law or ecclesiastical courts to enforce their jurisdiction over persons, but in a contest between the courts themselves, and that it went only from a superior to an inferior court, it becomes interesting now to trace its application in this country. The statute under which it is sought to maintain the jurisdiction the court has exercised in the case under consideration is a mere skeleton, so far as the question of jurisdiction is concerned. It provides substantially that the writ shall issue only out of the supreme court, and that it may issue upon application made to one of the judges of that court in vacation. It is silent, however, as to the grade or character of the court or officer to which it may be issued. I am of the opinion that the legislature never contemplated the application of this statute to a case like the one under consideration. Bearing in mind what has already been said with reference to the origin of this writ and the manner of exercising jurisdiction conferred by it, let us see what application it has to the case under consideration. Jurisdiction in this case is sought to be maintained solely upon the ground that the district court for the First judicial dis-

trict, sitting for the trial of causes arising under the laws of the United States, is absolutely without jurisdiction to try the case of the Lincoln-Lucky & Lee Mining Company, etc., and that, in contemplation of the statute, it is an inferior court, in the sense that the judge of another district sitting in chambers may issue to it a command absolutely forbidding it to proceed further in the cause. In discussing this question I shall endeavor to show—First, that the district court had jurisdiction of the subject-matter of the suit; and, second, that, whether it had jurisdiction or had it not, it was not subject to the control of a judge in another district. The act of the legislature passed February 22, 1889, which was entitled, "An act in relation to change of venue," provided, among other things, that the venue might be changed from a district court sitting as a court for the trial of territorial causes to a district court sitting for the trial of causes arising under the laws of the United States; the evident purpose being to enable a party to a controversy to obtain a jury drawn from a large area of country, and not, therefore, affected with local prejudices, for the whole act is devoted to the method of change of venue so as to obtain a fair and impartial jury. The legislature, in contemplation of the fact that one party might object to a certain county in the district while the other party might object to certain other counties, so that no one county in the district would be suitable for the trial, provided, in effect, that in such cases the judge might submit the cause to a jury drawn from the whole district. In the case under consideration the parties to the cause alleged under affidavit grounds of objection to each of the counties composing the district in which the cause of action arose, and thereupon the judge transferred the cause to the district court sitting for the trial of causes arising under the laws of the United States. The controversy, therefore, in this case,

involves the proper construction of this change of venue law, and the law of prohibition as embodied in section 2006, et seq., of the Compiled Laws. These sections constitute a substantial enactment of modern common law procedure by prohibition. The statute provides substantially that the writ shall be issued only out of the supreme court, and that it may be applied for to said court or to one of the judges thereof in vacation. It is silent as to the court to which it may be directed, and it is therefore necessary to resort to the authorities as contained in the text-books and in the adjudications of courts of last resort. And it is to be observed on consideration of this whole prohibition statute (Comp. Laws, sec. 2006, et seq.) that it contemplates a procedure only against an inferior court, for, while it authorizes a judge of the supreme court to issue it, it is nowhere said that it may be served on a judge. On the contrary, the statute speaks throughout of courts and parties, and provides a system of pleadings by which the court and party may be brought to trial by attachment, if necessary. The court and party upon whom the writ is served become the respondents, and a regular suit proceeds, wherein the relator is one party and the responding court and party constitute the other. Is it possible that the legislature ever contemplated authorizing a judge at chambers to institute such a proceeding as this against a judge of the supreme court sitting in another district? As I have already stated, a procedure by prohibition is the exercise of the very highest authority known to the law. It is the highest prerogative writ. "It is a writ," says Mr. High, "directed to an inferior court for the purpose of preventing the inferior tribunal from usurping a jurisdiction with which it is not legally vested." High, Extr. Rem. 762. Three things must concur, therefore, to give the court jurisdiction of this procedure: First, the court to

which the writ is directed must be a court of inferior and limited jurisdiction; second, it must be made to appear by the record or declaration supported by affidavit that such inferior court is about to usurp a power it does not possess, or is about to transcend its jurisdiction; third, it must appear that the party applying for the writ is without other remedy, as by appeal, writ of error, or writ of certiorari.

A proper solution of the first proposition is attended with considerable doubt as to what is an inferior court within the meaning of the rule.  On the part of the respondent it is insisted that, in order to support the jurisdiction, it must appear that the court to which the writ is directed is an inferior court, not only in the sense that its judgments or decrees are subject to review on proper proceedings instituted for that purpose, but that it must be a court of limited and special or peculiar jurisdiction.  It is insisted, therefore, that in this territory the writ does not issue from the supreme court to the district courts, the latter being courts of general common law and chancery jurisdiction.  In support of this contention we are referred to the case of Smith v. Whitney, 116 U. S. 167, wherein the supreme court say:  "The object of the writ of prohibition is to prevent a court of peculiar, limited, or inferior jurisdiction from assuming jurisdiction of a matter beyond its legal cognizance."  On the contrary, it is insisted by the relator that the test of jurisdiction lies in the question as to whether the court issuing the writ has general supervisory jurisdiction over the tribunal to which the writ is directed.  I am of the opinion that the district court is an inferior court in the sense that on a proper application—that is, on the statement of a proper case—the jurisdiction exists in the supreme court to issue the writ.  I am clearly of the opinion, however, that the jurisdiction is confined

to cases in which the writ is applied for. First, in aid of an appeal; or, second, to prevent such a palpable usurpation of power on the part of a district court as would result in irreparable injury to the relator,—a case in which an appeal, writ of error, or certiorari would not lie, if any such case should arise. I shall have occasion later on to discuss this branch of the case.

I shall proceed now to the discussion of the second proposition: Does the record disclose the fact that the district court was about to exceed its jurisdiction? It appears that the proceeding, which it was the purpose of the writ to withdraw from the consideration of the district court, is an action of ejectment, brought to recover certain mining property described in the pleadings. It is admitted that a district court of the territory sitting for the trial of causes arising under the laws of the territory possesses jurisdiction of such actions in ejectment. But it appears by the record that this case was about to be tried by the district court for the First judicial district sitting for the trial of causes arising under the laws and constitution of the United States. The proposition is that an action of ejectment is not a cause arising under the constitution and laws of the United States, and that, therefore, the district court sitting for the trial of such causes was not invested with jurisdiction of the subject-matter of such suit, and that, therefore, the writ of prohibition was a proper remedy. It is admitted that the act of the territorial legislature passed February 22, 1889, attempted to confer jurisdiction, and that the case, the trial of which it is the purpose of the writ to prohibit, is properly pending in that court if the act of the legislature is valid. It is insisted, however, that the territorial legislature was utterly without authority to provide for the trial of territorial business in a district court sitting for the trial of causes arising under the laws of the United States. This brings us to a

discussion of the question: What is a district court sitting for the trial of causes arising under the constitution and laws of the United States? Section 1865 of the Revised Statutes provides that every territory shall be divided into three judicial districts (by later legislation this territory is divided into five); that a court shall be held in each district by one of the judges of the supreme court, etc.; the following section, that the jurisdiction, both appellate and original, of the courts provided for in sections 1907 and 1908, shall be limited by law. Now, turning to sections 1907 and 1908, we find it provided that the judicial power in New Mexico shall be vested in a supreme court, district courts, probate courts, and in justices of the peace. It must be borne in mind that the district courts here provided for are what are now known as "district courts sitting for the trial of causes arising under the laws and constitution of the United States," which, for the sake of distinction, I shall call "federal courts," as distinguished from "district courts organized in the several counties for the trial of causes arising under the laws of the territory," which I shall term "territorial courts."

It will, in my opinion, aid us very much in coming to a proper conclusion of this matter to bear constantly in mind that the territorial government is the creation of congress. It may be destroyed as well as created by congress. It possesses no jurisdiction or powers, except those conferred upon it by congress. Every power it exercises is subject to the supervision and control of congress. Even its legislative enactments derive their authority from the consent of congress, for it is provided in its organic law, that the acts of its legislature must be submitted to congress for its approval. The governor, who is appointed by the president, is required to submit to congress, through the secretary of the interior, a full report of the pro-

ceedings of the territorial government, including the acts of the legislative assembly. As a matter of fact congress has not formally passed on each act of the legislature, it being assumed that the silence of that body implies its assent. In the case of Clinton v. Englebrecht, 13 Wall. 434, it was stated: "The theory upon which the various governments for portions of the territory of the United States have been organized has ever been that of leaving to the inhabitants all the powers of self government consistent with the supremacy and supervision of national authority, and with certain fundamental principles established by congress." And in a later case—National Bank v. Yankton Co., 101 U. S. 11 Otto, 129—the doctrine was laid down by the supreme court of the United States in the following emphatic language: "All territory within the jurisdiction of the United States not included in any state must necessarily be governed by or under the authority of congress. The territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective states, and congress may legislate for them as a state does for its municipal organizations. The organic law of a territory takes the place of a constitution as the fundamental law of the local government. * * * Congress may not only abrogate the laws of the territorial legislatures, but it may itself legislate directly for the local government. It may make a void act of the territorial legislature valid and a valid act void. In other words, it has full and complete legislative authority over the people of the territories and all the departments of the territorial governments." National Bank v. Yankton County, 11 Otto, 129; 9 How. 235; 13 Wall. 434. None of the powers of sovereignty exist in the people of a territory. The legislative assembly owes its existence, and draws all

its authority from the act of congress, not from its
election. The power conferred upon it and upon the
people of the territory may at any time be withdrawn
or modified by the federal congress. They can exercise
only a delegated power, and they must do that strictly
in conformity with the terms in which it is delegated.
27 Myers, Fed. Dec. 1009; Murrin v. Converse, 2
Chi. Leg. News, 113; Howe v. Gallagher, 3 Chi. Leg.
News, 251; Territory v. Lee, 2 Mont. 124. "Territories
are solely and exclusively the creatures of congress."
Stacy v. Abbott, 1 Alt. 85. Under the power of the
general government in governing the territories, con-
gress exercises the combined powers of the federal and
state governments, and may legislate directly for the
territory, although the organic act reserves no such
power. Gould & T. Notes U. S., p. 460; Am. Ins.
Co. v. Canter, 1 Pet. 511; National Bank v. Yankton
Co., supra; Freeborn v. Smith, 2 Wall. 160; U. S. v.
Church, 15 Pac. Rep. 473. The territorial government,
being the creature of congress, retains its very exist-
ence by the permission of congress, legislating under
the authority of congress. It follows that the only
test to be applied to the act of the territorial legisla-
ture is a question as to whether it is in contravention
of the act of congress. It is too clear for argument
that it is within the power of congress to establish
courts in the territory having full and exclusive juris-
diction of every possible question which could form
the subject-matter of litigation. Congress may author-
ize the territorial legislature to erect courts for certain
purposes, naming them, or it may forbid the organiza-
tion of courts for any purpose. The power of congress
on this and kindred matters is absolute.

Having determined that, subject alone to the con-
stitution of the United States, the power of congress
over the territories is absolute and supreme, we pass
now to the only question that is open to discussion,

and that is, what has congress indicated on the subject-matter of judicial power in the territory? It is provided that the judicial power of a territory shall be vested in a supreme court, district courts, probate courts, and justices of the peace, and that the jurisdiction, both original and appellate, of these courts, shall be limited by law. R. S., sec. 1866. It is also provided that, of the courts named, the supreme court and the district courts shall possess chancery and common law jurisdiction. Id., sec. 1868. It must not be overlooked that the courts of which we are now speaking are federal courts; that is, courts which are authorized by the act of congress. These courts exist independently of any legislative enactment. They owe their existence alone to congress, and exist independently of any legislation, and, indeed, they would exist and exercise their several jurisdictions if there were no organized territorial government. It will also be observed that the jurisdiction conferred upon them is full, complete, and comprehends every subject-matter of litigation. It must be kept constantly in view that the courts established by congress—that is, those that I have denominated "federal courts"—are authorized to try, not only causes arising under the constitution and laws of the United States, but those arising under the laws of the territory as well.

The purpose of congress was to establish, and it did establish, a complete judicial system clothed with plenary power over all matters of litigation, civil and criminal, common law, chancery, and probate, with original and appellate jurisdiction. This system it provided for, and offered to the people of the territory, as, under the decisions of the supreme court, it was authorized to do. The courts thus established were organized, as already observed, to try all causes arising under the laws of the United States, both civil and criminal; also all causes arising under the laws of the

territory, whether of common law or chancery cogni-
zance. The only distinction made by congress, so far
as it related to the courts, was one, not of jurisdiction,
but of practice, which was done by the act of Septem-
ber 9, 1850, which provided that the first six days or
so much thereof as might be necessary, of each term
of the district courts should be devoted to the trial of
causes arising under the laws and constitution of the
United States. It was but the one court, however,
dividing its time between two classes of cases. Rev.
Stat., sec. 1910. On the fourteenth of June, 1858, con-
gress authorized the judges of the supreme court to
hold court within their respective districts in the
county, wherein, by law of the territory, courts have
been or may be established for the purpose of hearing
and determining all matters and causes except those in
which the United States is a party. In addition to the
common law and chancery jurisdiction conferred, as
we have already seen, upon the federal courts, it was
provided that they should have and exercise the same
jurisdiction as vested in the circuit and district courts
of the United States. These provisions, as contained
in the act of 1850, are found in section 1910 of
the Revised Statutes. The same act of congress
which conferred on these courts common law and
chancery jurisdiction, also vested them with such
special jurisdiction as might be exercised by the circuit
and district courts of the United States, which includes
maritime jurisdiction and also jurisdiction of proceed-
ings in bankruptcy. The same act of congress pro-
vided also that the legislative power of every territory
shall extend to all rightful subjects of legislation not
inconsistent with the constitution and laws of the
United States. It will appear, then, that from 1850—
the date of the organization of the territory—down to
1858 there were no other courts in the territory vested
with common law or chancery jurisdiction save the

federal courts, and all offenses, as well those against the laws of the territory as those against the laws of the United States, were tried in those courts. Actions of assumpsit, debt, trespass, trover, eject- ment, criminal prosecutions, and causes arising in equity were all tried in these courts. There can be no doubt, therefore, that from the time of the organiza- tion of the territory down to the time when the terri- torial legislature organized the territorial courts, the federal courts had ample and exclusive jurisdiction of the subject-matter, the control of which in that court it is now sought to prevent by the writ of prohibition. There can be no doubt but that the territorial legisla- ture, in the establishment of the district courts to be held for the several counties of the territory, and in subsequent legislation, has attempted to confer on those courts exclusive jurisdiction of common law and chancery matter arising under the laws of the territory; and in view of the fact that congress has not seen fit to disapprove such legislation, it may be affirmed that the several acts of the legislature having reference to the jurisdictions of these courts prior to the change of venue act—which will be hereafter noticed—constituted a complete code, conferring on these courts exclusive common law and chancery jurisdiction in suits arising under the laws of the territory. Thenceforward the federal and territorial courts exercised distinct func- tions, the former dealing exclusively with litigation arising under the laws of the United States, and the latter exercising a jurisdiction which pertains in gen- eral to courts organized under the laws and constitu- tion of the several states. The two courts were presided over by the same judge, and the records kept by the same clerk, who kept the minutes of each court in a separate book. The juries of the federal courts were drawn from the counties composing the entire district, and were summoned by the marshal. The

juries of the territorial court were drawn from the
county, and were summoned by the sheriff.    With the
exception of certain legislation having in view the trial
of territorial matters by United States juries, the two
jurisdictions remained distinct until the passage of the
act already referred to as the change of venue law;
and the suit which the writ of prohibition was sued
out to restrain or prohibit is now pending in the dis-
trict court for the First judicial district sitting in the
county of Santa Fe for the trial of causes arising under
the laws of the United States, having been sent to that
court in strict compliance with the act of the legisla-
ture just referred to.    It will thus be seen that the
only question to be determined in this branch of the
inquiry is as to the validity of the act of the legislature.
If the act in question was within the purview of the
legislature, it follows that the district court has juris-
diction of the cause, and the writ of prohibition must
be dismissed.

As I understand the position of the relator, he
insists that the act in question was invalid for two
reasons:    First, because it is special legislation; and,
second, because the legislature, having heretofore con-
ferred on the territorial courts exclusive jurisdiction of
such questions, could not afterward restore such juris-
diction to the federal courts.    I will notice these two
objections in their order.

It is said that the act in question is special legisla-
tion, and is therefore in contravention of the act of
congress passed July 30, 1886, commonly known as
the "Springer Act," which provides substantially that
no local or special law shall be enacted by the legisla-
ture of any territory for summoning or impaneling
grand or petit jurors.    This court, in the case of Ter-
ritory v. Baca, 6 N. M. 421, held that the act of the
territorial legislature passed February 26, 1889, which
undertook to provide that in certain counties twenty-

one men shall constitute the grand jury, any twelve of whom might find an indictment, while in other counties the number of grand jurors should be twelve, any nine of whom might find an indictment, was in contravention of this act of congress, and therefore void; that the act of the legislature then under consideration was special within the intendment of the act of congress, in that it provided that in four counties of the territory a certain number of grand jurors was required to find an indictment, while in other counties a different number was required. No such objection can be urged against the act under consideration. It deals alike with all the people in each county of the territory. It is no more special in its character than any former legislation providing for a change of venue. It does not mean that under its provisions some suits must be tried in the territorial courts whilst other suits of precisely the same character may be tried in the federal courts. A suit pending in one county may be removed from such county, and on certain conditions mentioned, it must be changed to some county in the same district, while under other conditions set out in the statute it must be changed to the federal court, and in either event it must be tried by a jury drawn from the county or district in which the cause originated. Under the same conditions, any suit pending in any of the territorial courts may be removed for trial to the federal court. The statute is general in its character, and applicable alike to any county and to all the citizens, and is therefore in no sense special.

As to the second objection—that it was not within the power of the legislature to confer this jurisdiction on the federal court—it may be said that the proposition is by no means free from doubt. It has been compared to an effort on the part of the state legislature to confer jurisdiction on the federal courts. I am of the opinion, however, that there is nothing in this

objection. A comparison of the relative character of
the state and territorial governments will discover such
a radical difference with respect to their relations to
the federal government that no common test will be
found to exist. I shall not undertake to repeat what
has already been said with reference to that complete
parental relation in which the national government
stands to the territories. The situation of the latter
as to the former is that of pupilage. The relation of
the territories to the national government is like to
that of an infant to its parent. The parent may bestow
upon the infant whatever of his goods he may wish,
and the latter may return them, and insist upon his
right to be supported. So the territorial government,
in the exercise of its inclination, may decline any right,
jurisdiction, or power conferred upon it by the national
government. Suppose the territorial government had
never organized any court for the trial of causes arising
under the laws of the territory. It is not pretended
but that in such event the federal courts would have
retained and continued to exercise the jurisdiction
bestowed on them by virtue of their creation. Suppose
the territorial legislature should now repeal all laws
enacted with reference to territorial courts. Will it be
pretended that the jurisdiction drawn from the federal
courts by virtue of the creation of the territorial courts
would not revert eo instante? So far as I am advised,
these propositions are not controverted. Suppose,
again, that the act under consideration, instead of its
being of recent enactment, had been enacted originally
as part of the code establishing local territorial courts.
What is there in the organic acts or the general policy
of congress with reference to the territories that would
have rendered such provision void? Congress was
under obligation to the people of the territory to pro-
vide them with all needful protection, to provide
them with a governor, and with courts vested with

ample jurisdiction for the ascertainment and enforcement of their rights, saying to them, however, that they might provide themselves with so much of the machinery of local self-government as might to them seem proper, subject alone to the reserved right of congress to disapprove of so much of such local regulations as that body might deem inexpedient. This being the relation between the inferior and superior jurisdiction, was it not competent for the legislature, by and with the consent of congress (and without that consent it could do nothing), to provide that certain forms of action should be tried in the territorial courts sitting in the several counties for the trial of causes arising under the laws of the territory, unless it should appear that by reason of local prejudice a fair and impartial trial could not be had in the local territorial court, in which event such suit should be brought, under the existing law, into the federal court. The territorial legislature having enacted the provision, and congress having assented to or approved it, what power is there to object? There is not the slightest suggestion, then, that such provision would contravene any requirement or limitation found in the constitution of the United States. Such a provision would not have been in violation of any act of congress. That body had already provided that "the legislative power of every territory shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States."

Certain restrictions have been imposed from time to time. In the very act from which the above quotation is taken, it is provided that no law shall be passed interfering with the primary disposal of the soil, that no taxes shall be imposed upon the property of the United States, and that the property of nonresidents shall not be taxed higher than the property of residents. Numerous restrictive acts have from time to

time been enacted; among others, the act, already referred to, prohibiting special legislation; but the act under discussion is not, as we have seen, special legislation, nor is it pretended that it contravenes in terms any act of congress. Is it, then,—or, rather, was it at the date of the legislation creating our local and territorial courts,—a "rightful subject of legislation," within the purview of the enabling act? The validity of its provisions seems to me to be so clear as not to admit of argument, unless, indeed, something is to be said of the contention that it was not within the power of the legislature to establish a judicial system of local courts without covering the whole ground of local jurisdiction; that it must either adopt a complete system or decline it altogether. But there is nothing in the relations existing between the territory and the national government, or in the policy of congress as disclosed by its legislation, that requires this election. On the contrary, every circumstance surrounding that relation points to a different conclusion. On the one hand, the sovereign power relating to the internal as well as to the external affairs of the territory resides with the people of the whole country as represented in congress. It was perfectly competent for the nation, or parental government, to bestow whatever power of local self government might seem consistent with the welfare of the people of the territory, and to withhold such as it was not deemed proper to bestow. On the other hand, it was equally competent for the territory to accept or reject the conferred privileges, or to accept any part or to decline any part. It does not follow that because the powers of the legislature were made to include all rightful subjects of legislation, the legislature was bound to legislate on every rightful subject of legislation or to legislate on none. The legislature was authorized to cover so much of the ground as it thought proper, subject to the correlative power of

congress to disprove and to annul such legislation in whole or in part. This change of venue act must, therefore, be considered as an integral part of the local legislation on the general subject of territorial courts. It must be treated precisely as if it formed a part of the first legislation on the subject. I do not think it affects the character or force of the act to say that the legislature, having heretofore undertaken to provide a system for the trial of such matters by local courts different from the court authorized by the act of congress, could not afterward restore to the federal courts the jurisdiction those courts had before the establishment of the territorial courts. There is nothing in the former legislation that is beyond the control of the legislature. Suppose the legislature should repeal all legislation giving the courts jurisdiction of this character. It is admitted that in that event the jurisdiction would revert to the federal courts. But the jurisdiction of these federal courts, so far as territorial matters are concerned, is left entirely to the territorial legislature; for the supreme court has decided in the most unequivocal terms that, subject to a few express or implied conditions in the organic act, the practice, pleadings, as well as jurisdiction, of the territorial courts were intended to be left to the territorial assemblies. Clough v. Curtis, 134 U. S. 368; Hornbuckle v. Toombs, 18 Wall. 652.

I come now to the third and last proposition, which is that the writ of prohibition does not lie when there is other proper remedy, as by appeal, writ of error, or certiorari. High, Extr. Rem. 771; Ex parte Warmouth, 17 Wall. 64; 2 Hill, 363; 79 N. Y. 591. Numerous authorities might be cited in support of this proposition, but they would add nothing to the perfectly apparent reason for the rule. There are quite a number of writs that are denominated extraordinary, among them the writ of mandamus, injunction, and

prohibition; and of these three the writs of mandamus and injunction have come into more common use. They are consequently to be regarded no longer as extraordinary writs. But the writ of prohibition is in law and in fact and in experience an extraordinary writ. This territory has been organized for nearly half a century, and yet this is the first time that a judge, sitting in his chambers, has issued his fiat to another district judge, sitting in open court, commanding him to adjourn the trial in which he was engaged. It is extraordinary, too, in the fact that able counsel have searched the books in vain for a single precedent. I agree that the writ has been frequently issued by a single judge for and on behalf of the court of which the judge issuing the writ was a member. One judge of the court may issue it for the court, but he issues it to a court of inferior jurisdiction. Not a single case can be referred to in which a district judge has issued the writ to the judge of another district, or one circuit judge to another circuit judge. But my contention is that this writ can not be issued as a substitute for an appeal. There are some propositions so clear that it is difficult to support them by argument or illustration. And this is one of them. I have endeavored to submit argument and authority showing that where appeal lies there is no necessity for this proceeding. I shall now take the present case as an illustration. A suit in ejectment is pending in a district of the territory. The defendant has interposed his demurrer or motion to dismiss for want of jurisdiction. The demurrer or motion has been overruled. After a week spent in the trial, a judgment is rendered, from which an appeal lies to the supreme court, where his remedy will be full, ample, and complete. Instead, however, of availing himself of this plain and adequate remedy, he goes to the judge of another district, and procures from him an order on the trial judge to suspend until

the supreme court shall have passed upon the question of jurisdiction. Again, a party is indicted by the district court sitting for the trial of causes arising under the laws of the territory for assault on a mail carrier. The defendant pleads to the jurisdiction. His plea is overruled, and he appeals to a neighboring judge for a writ of prohibition, and the case is sent to the supreme court. Or a party is indicted for murder, and pleads to the jurisdiction, alleging that the offense was comitted in a county outside of that in which the indictment was found. The issues on this plea being found against him, he applies for a writ of prohibition. But it is unnecessary to pursue this line any further. The introduction of this doctrine will bring anarchy to our judicial system.

There is one other view of this question that to my mind demands serious consideration. The same body, to wit, the legislature of the territory which passed the prohibition act, passed also the change of venue act. It is admitted that the suit which this writ is sought to prohibit is properly pending in the court if the legislature had power to confer the jurisdiction. To maintain the jurisdiction, therefore, of the court to issue this writ, is to say that the legislature may by one act attempt to confer jurisdiction on a court, and may by another act authorize a different court to absolutely prohibit the exercise of that jurisdiction, for it must not be forgotten anywhere in this investigation that the court to which this writ has been directed is not attempting to usurp a jurisdiction. It is simply exercising a jurisdiction conferred or attempted to be conferred upon it by the legislature, and, moreover, a jurisdiction invoked by both parties to this litigation. Mr. Elliott, at page 547 of his work on Appellate Procedure, distinctly lays down the doctrine that where a party wrongfully obtains a change of venue he is precluded from denying the jurisdiction which he has

invoked. And this whole proceeding presents the spectacle—probably without a parallel in the history of judicial procedure—of a case in which a party, after having sought a change of venue from a court of acknowledged jurisdiction, now seeks to render the adjudication of the matter impossible by denying the jurisdiction of the only court which can now try the cause. The action of the court in awarding the final prohibition to the district court confessedly puts an end to this suit, and denies to the respondent any right to have his cause tried in any court.

Conceding, as I believe it is conceded, that the extraordinary writ of prohibition does not lie where complete remedy can be had by appeal or writ of error, it is claimed by the majority that judgment rendered in the court below against the relator would have been so absolutely void that it could not have been reviewed in this court. I have not had time to examine the authorities cited for this proposition, but I confess that I had not supposed that the right of an appeal from the district to the supreme court from any judgment was a question open for argument. Section 558 of the Compiled Laws provides in express terms: "Every person aggrieved by any judgment or decision of any district court in any civil case may make his appeal to the supreme court." But it is said that a judgment in this case would have been coram non judice, and, therefore, so absolutely void as not to give the appellate court jurisdiction. If judgment had been rendered in the court below against the relator, and on appeal to this court the respondent had insisted that his judgment in the court below was so absolutely void as not to give this court jurisdiction, is it possible that this court would give such a proposition serious consideration? His position would be precisely like that at present occupied by the relator.

VOL. 7 N. M.—34

He would convict himself of having used the courts to enable him to accomplish a trick and perpetrate a fraud. But let us see what there is in this proposition that an appeal does not lie from a void judgment. The doctrine is thus laid down in Elliott's Appellate Procedure, in section 110: "An appeal will lie from a void judgment. There is solid reason for this rule, inasmuch as it enables a party injured by such a judgment to remove it from the record without injury to the rights of adverse parties, for they can have no rights under a judgment which has no force. It is a sacrifice of substance to a barren technicality to hold, as some of the courts do, that no relief can be had against a void judgment. Our court has, whenever the question has been presented, refused to enforce any such rule, and has granted relief, although the proceeding was a nullity." This proposition is supported by such an array of authorities as to place it beyond the pale of legitimate controversy. 2 Cranch, 126; 6 Wend. 466; 13 Pick. 172; 7 Metc. (Mass.) 590; 9 Gill (Md.), 92; 5 Md. 350; 4 Wis. 201; Id. 808; 28 Md. 489; 13 Gratt. (Va.) 680; 21 Gratt. (Id.) 582; 16 Wall. 435; 2 Duv. 540; 6 Bush, 396; 8 Bush, 383; 2 Hill, 367. And after full discussion this doctrine was distinctly held by the house of lords as late as 1852.

There is, however, another consideration which is fatal to this writ. Not only did the relator himself invoke the jurisdiction which he now seeks to avoid, but, having attained his purpose, he interposed no objection to that jurisdiction. I believe that it is not denied that, in order to entitle a party to the benefit of this extraordinary writ, it must be shown that he has availed himself of every legitimate means for protecting himself against the abuse and the usurpation of the court to which the writ is directed. There was no plea to the jurisdiction; non constat, therefore, that the court would not itself have declined the jurisdiction.

It is not a jurisdiction which had been sought by the court. It was not being usurped, but was cast upon the court by legislative enactment, which, under the authority of the supreme court of the United States, had the right to give the jurisdiction. The court was proceeding not only in accordance with the act of the legislature, but in accordance also with the authority conferred on it by congress. (For this change of venue act, having, with other legislation, been submitted to congress for its approval, must now be regarded as valid and subsisting). I therefore affirm with perfect confidence that not a single adjudicated case can be found in which the writ has been maintained against a court of general jurisdiction proceeding to adjudicate in an orderly manner a cause of action regularly brought into said court, under the rules, practice, and pleadings provided by a legislative body having the authority to confer upon it general jurisdiction. The reason given by the authorities why it is first necessary to interpose a plea to the jurisdiction is that the court may have an opportunity to pass upon it; for conceding, for the argument's sake, that it was not invested with the jurisdiction to hear and determine the matter, it at least had jurisdiction to dismiss the cause, or to remand it to the court whence it had been sent. If it had jurisdiction to decide wrong, it had also jurisdiction to decide right, and, deciding either right or wrong, its action could have been brought to this court for review. Morse v. Burckhartt, 87 Mo. 539; Ex parte Braudlicht, 2 Hill, 367.

I have endeavored to maintain the propositions:

First. That the district court, or what I have termed the "federal court," had jurisdiction of the subject-matter.

Second. That whether it had jurisdiction or not was a matter that could be inquired into on appeal.

Third. That in order to invoke the extraordinary

power of a prohibition it was first necessary to interpose a plea to the jurisdiction.

Fourth. That a territorial district court sitting for the trial of causes arising under the constitution and laws of the United States is not, like a magistrate, a court of inferior, peculiar, and limited jurisdiction, in the sense that places its procedure entirely under the control of another district judge sitting at chambers, outside of the judicial district, and having no other knowledge of the proceeding sought to be prohibited than may be given to him by one of the litigants.

Fifth. That the legislature never contemplated the bestowal of any such extraordinary power; and

Sixth. That an act of the legislature which should undertake to confer on a judge sitting at chambers the power to prohibit by his fiat another judge holding court in another district from the exercise of a jurisdiction conferred on it by an act of the legislature, passed in pursuance of authority conferred by congress, and approved by congress, would be so absolutely void that no court could afford to recognize its validity in any proceeding.